MORRISON v. SPRINGER: THE STATE OF IOWA, *ex rel.* WILSON, v. BURT: THE STATE OF IOWA, *ex rel.* O'NEILL v. WATSON.

1. CONSTITUTIONAL LAW. The Constitution, as applied to the legislative department of the government, is a restriction, and not a grant of power: and it is competent for the Legislature to prescribe the qualifications of electors, and the time, place and manner of exercising the elective franchise, when not expressly prohibited from so doing, or where the prohibition is not implied from some express provision of the Constitution.

2. SAME: ARTICLE CONSTRUED: Section 1, article 2, of the Constitution of 1857, defines only the qualifications of an elector, and does not prescribe the place of exercising the elective franchise as a test of qualification. The power to fix the place and manner of its exercise is left with the Legislature.

3. STATUTE CONSTRUED. The provisions of an act approved September 11th, 1862, entitled "an act to amend Title 4 of the Revision of 1860, so as to

enable the qualified electors of the State in the military service to vote at certain elections, are not inconsistent with section 1, article 2, of the Constitution of 1857, for the reason that they permit such electors to cast their votes at polls opened and conducted beyond the limits of the county and the State of which they claim to be residents.

4. CONSTITUTIONAL LAW: GENERAL RULE. The Supreme Court will declare a law unconstitutional only when it is clearly, palpably and plainly inconsistent with the provisions of that instrument.

*The first case was appealed from Benton District Court, the second and third from Clayton District Court.*

THURSDAY, DECEMBER 10.

SPRINGER was declared, by the Board of Canvassers, duly elected to the office of Clerk of the District Court of Iowa county, at the October election, 1862. The Hons. James Burt and George Watson were also in like manner declared elected to the offices of District Judge and Attorney in and for the Ninth Judicial District, at the same election. Morrison and the Relators were the respective opposing candidates, and instituted these proceedings to test the right of the several incumbents to said offices. The first case was commenced under chapter 37 of the Revision, which relates to "Contesting elections." The two others were "Informations" in the method provided for in chapter 51 of the Revision.

On the hearing below, the first case was decided in favor of the contestant,—Hon. N. W. ISBELL, Judge of the 8th Judicial District, presiding and delivering the following opinion:

"This cause comes before the court on *certiorari* directed to the Court for the trial of the contested clerkship of Iowa County between the parties.

"The incumbent received the greater number of votes, including those cast in the military camps out of the State, under the act of September 11th, 1862; and the contestant the greater number, provided those out of the State are to be rejected.

"Minor questions are raised as to the admissibility of testimony, and the like; but the vital question is, as to the constitutionality of the act authorizing soldiers to vote out of the State.

"A wide field has been taken in argument, but we see no force in any of the objections to the constitutionality of the act except this, whether our Constitution requires a personal presence of the voter within the County of his residence for the last sixty days in order to vote.

"We think the whole question narrowed down to this, and the only clause of the Constitution bearing upon it, except by remote inference, is that contained in Art. 2, Sec. 1, which provides that "every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the County in which he claims his vote sixty days, shall be entitled to vote at all elections which now or hereafter may be authorized by law."

"That the affirmative description of a voter contained in this clause implies a negative as to all not coming within it we have no doubt. Otherwise the Legislature could have struck out the word "*white*" without a submission to the people.

"But it is claimed, on the part of the incumbent, that the leading idea and object of this section is to define who shall enjoy the right of suffrage, and not where it shall be exercised; and that the words "of the county in which he claims his vote," must be taken in subordination to the leading idea, and held to qualify residence only, and not mark a distinctive feature in the description. And it is insisted that to construe these words any other way would be to deprive the Legislature from affixing a township residence, or prevent a person coming within the description thus understood from voting at any township, school district or corporate election in the County he might choose, only so that the election was authorized by law.

"We have no doubt the leading object of this clause is to define who shall be entitled to vote. But we have as little doubt that to entitle a person to vote he must fill the description in every material particular.

"We must not confound the voter with the person of the voter. A voter as defined by the clause represents a complex idea, made up of several less complex. The word

combines the idea of a white person—a male of the age of twenty-one years—a citizen of the United States—a resident of the State of Iowa for six months next preceding the election, and a resident of the county in which he claims his vote sixty days.

"Is not the claiming his vote in the county of his residence as essential to the perfect idea of a voter as that he be white? True, the incidents of citizenship, residence in the county, and the claiming his vote therein, do not inhere in the person of the voter, as do those of age, sex and color. But do they not equally inhere in the voter by force of the constitutional description.

"While the primary or leading object of the section may be to define who shall enjoy the right of suffrage, instead of where he shall exercise the right, it is to our mind clear that in describing the voter, an incident is attached to him, which as necessarily limits the place of enjoyment of the right to the county of his residence (that is, requiring him to claim his vote there), as though it had been the primary object of the section to determine where the right should be exercised. If this is so, it is of little consequence whether the end is attained by attaching such incident to the description of the voter, or whether it be effected by a separate title, headed—"Where the right of suffrage shall be exercised," and a separate section declaring — "Any person entitled to vote shall claim his vote in the county of his residence for the last sixty days."

"We conclude that the limiting the field for the exercise of the right to the county in which it is claimed, is a material feature of the description of a voter, by the clause. We can but believe the claim here mentioned is an actual personal claim in contradistinction to an ideal, or (if such a thing is possible) legal claim.

"Nor is the difficulty removed by saying, if the full weight is given to the phrase it can only mean that a voter shall not vote in the State in a different county from his residence. As for example, a resident in Linn county shall not vote in Benton. For if it means this, it cannot well be held that the framers of the Constitution intended to limit voting to the county of the residence of the voter within the State, and leave an unlimited right outside the State, to be provided for by the Legislature. But the inference would rather be, that they did not consider such claim

Morrison v. Springer.

possible and did not therefore provide for it; or that having defined a particular limit, within which he should claim his vote, no other need be defined to make it certain.

"If the power to confer the right is doubtful, then it is proper to draw arguments from inconvenience to determine what the framers of the Constitution intended by language used which appears to bear against the right. But into this field of argument we do not propose to enter.

"To hold that the clause limits the right to vote to the county in which the right is claimed, does no violence to the language used. To hold otherwise, argues out of the Constitution a plainly written phrase.

"Nor is this phrase without meaning. It is easy to say, that the framers of the Constitution were only attempting to define a voter in the abstract. But it is hard to believe that they intended to frame a Constitution for an elective government, and no where in it, in any manner attempt to define where the right of an elector should be exercised. If we give to this clause its natural (and we think necessary) meaning, this is clearly and succinctly done. If the meaning is as contended for, the whole subject of where the elector shall exercise his right is left open to legislation, and inasmuch as legislators are the judges of the expediency of a law where they have the power to enact it, there is no limit to the lengths they may go in this direction.

"Had the plain men of the country (and they are they who adopted it), been told that under this clause an election might be held in Missouri or Tennessee, we can but believe that, from the plain reading of the clause, they would have regarded the objection captious. And it is such a construction, if we can arrive at it, as we believe those adopting it put upon it when they accepted it as their fundamental law, that we are bound to give to it, rather than one which may be sustained only by the refinements of learning.

"Such men had been accustomed to see a man claim his vote by presenting himself at the poll and offering his ballot, to be received and counted by the judges of an election, and when they read in the draft of the Constitution, in addition to his other qualifications, that he must be a resident "of the county in which he claims his vote," the idea of his claiming in any other county, or in any other

manner, than that to which they had been accustomed, would never enter their minds. They would not suppose that under the phrase, by a fiction of law, a man could be held as claiming his vote in Iowa county, while he was presenting it in Tennessee. Though familiar with the idea that a man may be a resident of a county without being all the while in person there, they were not with the idea that a man might claim his vote in a county and State where he was not.

"Corporations for pecuniary profit often hold their elections where it will best subserve the convenience of stockholders, provided their charters will allow, and even vote by proxy; but that a civil corporation should hold an election out of the State is an anomaly.

"We cannot believe that any man, at the adoption of the Constitution, regarded its meaning in the light claimed, much less any of its framers.

"Nor do we see any necessity for holding, because we hold that the clause requires a voter to claim his vote in the county of his residence, that the Legislature may not limit township, school district and corporate elections to the residents within their respective boundaries.

"Believing the clause requires a voter to claim his vote in the county of his residence, we must hold such as were cast outside illegal, and, therefore, reject them.

"We come to this conclusion reluctantly, for the reason that we hold it eminently just that those noble men who have been drawn away to peril their lives to maintain law should not be deprived of this high and distinctive right of citizenship, except for cogent reasons, and because it always becomes the modesty of an inferior judicial tribunal to bow to the wisdom of the Legislature, leaving to the courts of the last resort the task of deciding their acts unconstitutional, unless they are palpably so.

"To the soldier we have no apology, believing that no class of men are more desirous than they that the Constitution should be faithfully maintained.

"N. W. ISBELL, Judge, &c."

In the others, the incumbents were successful. As they all involve the same question, they will be found considered together in the opinion.

*Fairall & Boal* for the contestant, Morrison.

I. In the application to the District Court for the writ of *certiorari* in this cause, a number of questions were presented touching the admissibility of testimony offered on the part of Morrison. These questions were of course determined by the Court. The correctness of these determinations we have no disposition to argue at this time; but waiving them proceed upon the hypothesis that the objections made, by the appellant, to the testimony of the appellees in the Court below, were groundless, and that the facts were fully proved as laid in the statement of appellee; and consider the more important and material question in the case.

Is the act entitled an act to amend title four of the Revision, so as to enable the qualified electors of this State, in the military service, to vote at certain elections, &c., constitutional?

Before we proceed to the argument of this question, we wish to call the attention of the Court to the fact that the Court below, in its judgment, as will appear from the transcript in the case, did not decide the law unconstitutional in its operation within the State; but (to employ the language of the contesting Court as found in their opinion, afterwards affirmed by the District Court) they decided the law "*unconstitutional so far as it was intended to operate extraterritorially ;*" but inasmuch as we conceive that an act of the Legislature of the State, not in conflict with the Constitution of the State, may have force and effect beyond the limits of the State, we argue that the law is constitutional within the State, and afterwards discuss the question as to the validity of the law in its extra-territorial operation.

1. In the argument of this question, it is conceded, on the part of appellee, that there is no conflict between the provisions of this law, known as the soldier's voting law,

and any express provision of the Constitution of the State of Iowa, and the only conflict claimed to exist, is a conflict between the law, and an implied provision of section 1, article 2 of the Constitution, fixing the place of voting.

For convenience we quote the section: "Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State, six months next preceding the election, and of the County in which he claims his vote, sixty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law."

This section clearly fixes the qualifications of every elector:

*First.* "That he shall have been a white male citizen of the United States, of the age of twenty-one years."

*Second.* "That he shall have been a resident of this State six months next preceding the election, and of the County in which he claims his vote, sixty days."

"And possessing these qualifications, he shall be entitled to vote at all elections which are now, or hereafter may be, authorized by law." If then it is by any implication from this section of the Constitution, that such prescription of place exists, such implication must be derived from what we, for convenience, may make the 2d subdivision of that section. The language of the subdivision prescribes a residence in the State six months preceding the election, and a residence in the County in which he claims his vote, sixty days. This touches only the qualification of the elector, unless it is argued that the term "resident" as therein used, means an actual residence or presence within the State and county for the time prescribed, in which case we concede the existence of a reasonable inference that the framers of the Constitution intended by that section to designate the place of voting.

The term domicile, and the term residence, as used in our

Constitution, are synonymous, as is well settled by all the authorities. When we use the term residence as used in section 1, article 2 of our Constitution, we mean that place where a man establishes his abode, enjoys his rights, makes the seat of his property and business,— the place where he establishes himself with a present intention of making it his permanent abode. This, Justice STORY declares, is the usual legal signification of the term residence. He says, Confl. Laws, § 41, "By the term domicile is meant the place where a person lives or has his home. In this sense the place where a person has his residence, inhabitancy or commorancy, is called his domicile. In a strict and legal sense, that is properly the domicile of a person where he has his true, fixed and permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning." Sec. 42. "There is no doubt that every person has his domicile in that place which he makes his family residence and principal place of his business, and from which he is not about to depart unless some business requires; when he leaves it, he deems himself a wanderer." Sec. 44. "Actual residence is not indispensable, to retain a domicile after it is once acquired, but it is retained *animo solo* — by the mere intention not to change it or to adopt another : if, therefore, a person leaves his home for temporary purposes, with an intention to return to it, this change of place is not in law, a change of domicile. Thus if a person should go on voyage to sea, or to foreign country for health or for pleasure, or for business of a temporary nature, with an intention to return, such a transitory residence would not constitute a new domicile or amount to an abandonment of the old one,— for it is not the mere act of inhabitancy in a place which makes it the domicile, but it is the fact coupled with the intention of remaining there, *animo manendi.*"

This leads us to the conclusion that the residence desig-

nated by the Constitution, when once acquired, is still retained, unchanged and unaffected, by an act of the resident, other than a departure from his place of residence, with an intention of changing that residence permanently.

Is there a material difference in the case of the soldier, volunteering to be absent, in the military service for a fixed time? Is there a reasonable ground of inference, or any evidence whatever, in the case of any one of the electors whose votes are a matter of contest in this case, that such electors' removal beyond the limits of the county of his residence, or of the State, was with a view to a permanent change; and that at the time of such departure there existed, on his part, no intention of returning to his former place of residence. Upon this point the Court can entertain no doubt; indeed, there can be none. That, without a single exception, the Iowa soldiers claiming the right of suffrage, under and by virtue of the soldiers' voting law, quitted their residence not only with a fixed, and in a majority of instances a declared intention, but a strong hope of returning to that residence, at the expiration of their term of enlistment.

If this use and definition of the term resident as used in section first, article second of the Constitution, is correct, then, as a necessary sequence, persons who possessed the legal qualifications of electors of Iowa county, Iowa, still retain, during their temporary absence, their qualifications as residents, unaffected by that absence. And if our view of the law, to wit; that a man may be absent from the place of his residence and yet retain that residence, unaffected and unimpaired, is correct, then it follows, as a matter of course, that the term as used does not, by implications, fix the place of voting or restrict it to the county of the residence of the elector.

2. Again, it is insisted by counsel for the appellee that the words used in section 1, article 2 of the Constitution,

Vol. XV.—40

"*in which he claims his vote*," clearly assert the necessity of the actual presence of the voter and a manual delivery of the ballot ; and in support of the position assumed, they quote the opinion of the Supreme Court of Pennsylvania, in the case of *Chase* v. *Miller*, Amer. Law Register, Jan., 1863.. The decision in the case just referred to, and the comments of the learned judge delivering the opinion upon this particular point of the case, were undoubtedly correct. The Constitution of Pennsylvania, as amended in 1837 and 1838, section 1 of article 3, reads as follows : " In elections by the citizens every white freeman of the age of twenty-one years, having resided in this State one year and in the election district where he offers to vote, ten days immediately preceding such election, and within two years, paid a State or county tax, which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector."

There is an obvious distinction between the Constitutions of these several States. In the language of WOODWARD, J., to offer to vote by ballot is to present one-self with proper qualifications, at the time and place appointed, and make manual delivery of the ballot to the officers appointed by law to receive it." But to claim a vote, as used in our Constitution, is simply to assert a right to vote, unconnected with or unaccompanied by any intention to vote. The language is used in that section of the Constitution, for the purpose of more clearly specifying the qualifications of the elector, and not for the purpose of directing where the claimant shall cast his ballot.

3. But while we insist that our Constitution does not, in its terms, fix the place of voting, either in its letter or spirit, we do claim that it does, in express terms, vest the right of such prescription in the Legislature of the State. It provides that every person possessing the proper qualification " shall be entitled to vote at *all* elections, which *are now*,

or *hereafter may be*, authorized by law." The Constitutional Convention, after prescribing the qualifications of an elector, not only refused to take jurisdiction of the time, place and manner of holding elections, but conferred that power upon the law-making power, or Legislature of the State, as constituted by that Constitution. An elector "shall be entitled to vote at all elections which are now, or hereafter may be, authorized by law," plainly indicating that, had there been in existence, at the date of the adoption of the Constitution, a law giving a resident of any county the right to vote beyond the precincts of his own county, such a law would, by virtue of the Constitution itself, remain valid, after the adoption of the Constitution. Now, if such a law, existing at the date of the adoption of the Constitution, would have been in harmony with the letter and spirit of that instrument, why not a law, since enacted. 2 Const. Debates, 867.

This question has been determined by the Supreme Court. *The State of Wisconsin, ex rel. Jos. A. Chandler*, v. *Willet S. Mair*, MSS. opinion.

There is a striking similarity between the Constitution of that State and our own, under this head, which, when compared with that of Pennsylvania and Connecticut, makes the contrast between the letter of those last named and our own appear all the more wide.

The Constitution of Wisconsin, like our own, fixes the qualifications of the voter, and is similar to our own in language and phraseology, and unlike the Constitutions of Connecticut, Pennsylvania, Illinois, and some other States, (which in express terms restrict the elector, in voting, to the place of his residence) vest the right of fixing the place of voting, in the Legislature.

4. But it may be contended that section 1, article 2, is susceptible of conflicting constructions. We are unable to discover any conflict, or more than reasonable construction of the law. But if the section will admit of more than one

construction, it is undoubtedly the duty of the Court to give it that one which will best carry out its object, (see § 428, Story on the Const.,) and the object of the section being to secure to every man of proper qualification, the right of suffrage, as a civil right, most dear and important to him. Should the Court determine that a resident of Iowa county still retains that residence, though absent from his county, in the army, his effects, place of business, home, and, in many instances, his family still remaining in said county, the Court must, as a logical sequence, decide the law constitutional within the State.

II. If then, the law is constitutional within the State, can it have any effect or operation beyond the limits of the State? This is the question presented to the Court by the appeal; but it being clear that a law, unconstitutional within the State, cannot have vitality beyond it, we preferred discussing, in the first place, its constitutionality at home.

1. It is a general maxim of international law, that every nation possesses an exclusive sovereignty and jurisdiction within its own territory, and that no state or nation can by its laws directly affect or bind property out of its own territory, or bind persons not resident therein, or the subjects of another state, or nation: but every nation has a right to bind its own subjects by its own laws in every other place. Story on Conflict of Laws, §§ 18, 20, 21.

This right exists by reason of the natural allegiance every man owes to his government.

In the authorities just referred to, Story says, that residents, of any particular state, are affected by the laws of that state, though temporarily absent, and this control is assumed entirely on the ground of the allegiance due from the subject. But we do not assume in the argument, that the laws of one state impose any obligation upon, or compel any respect from any other state, or its subjects; for if the laws of a state, made with a view to operation in another state

are incompatible with the laws of the latter, or would work any hardship or innovation upon the rights of the subjects of any other state, such laws will be entirely disregarded; but when the legislature of a state assumes to make a law for the benefit of the subjects of that state, extending to them, certain civil rights, beyond its own territory, the full enjoyment of which can in no manner diminish or impair the government or established authority in another state, where such rights are to be enjoyed, such law is as vital, valid and effective as it is in its enforcement within the State where enacted; and this is no new theory.

In the case of contracts, for instance, the law of the place of contract has long been construed, to take precedence in the enforcement of the contract; thus, if a person wanting the legal capacity to contract, make a contract, such incapacity is not cured by the laws of another state, nor can such contract be enforced therein, although such legal incapacity does not there exist. And if by the law of the place where a person have his domicile, he should attain his majority at an age earlier than twenty-one years, and have the capacity to dispose of his property there, at that age, the same capacity will attend him into another state or county, where otherwise he might not be capable of alienating or disposing of his property, at an age less than twenty-one years.

If in one state, a man attains his majority at twenty-one, that being his domicile or residence, so long as that remains his residence, he is of the age of majority in every other state, and the reverse of this principle is sometimes true, when contracts legal in one State, are made with intent to violate the laws of another, against good morals or public right, the Courts of the latter will assume to determine how far such contracts shall be enforced. *Davis* v. *Bronson*, 6 Iowa, 140.

These are principles of law, long settled; and domonstrate

not only the recognition of the law of. a state beyond its territorial limits, but their actual enforcement, within the jurisdiction of another state.

The recognition of the laws of one state within the jurisdiction of another (when not an actual innovation upon the laws of the latter, or the rights of her subjects) obtains by obligation of the laws of comity, and while indispensable in the commerce of nations, is so, in a much greater degree, in the intercourse of states constituting a common union. But this is not all. There are numberless instances wherein a state assumes to make laws, not only for her own subjects in foreign territories, but for the control, guidance and direction of the subjects of another state.· Each state directs the mode in which wills and deeds for the conveyance of real estate shall be executed and acknowledged in order to convey property within its limits. Each state presumes to confer the power to take acknowledgments and depositions upon commissioners resident in other states, and specifies in what particular manner the several acts shall be done; the laws of other states to the contrary notwithstanding. These are acts for the regulation and management of the internal affairs of the state, over which it has exclusive jurisdiction, and the right to make these laws, and confer these powers, has never been questioned. But upon how much stronger footing does the case of the soldiers' voting law stand ? The Legislature, in this case, have only assumed to confer a right upon the subjects of the state, upon its own citizen, not to confer a right to vote (for that right they had, as residents of the state), but only the power to exercise that right beyond the limits of the state, an act touching the regulation of the internal affairs of the state, but a right unlike those referred to above; to be exercised by its own citizens.

This principle of jurisdiction, on the part of a state or nation over her own subjects, in a foreign state or country

is reiterated by Congress, in an act, passed March 3d, 1825, Laws of U. S., Dunlop, 1789–1856, for the punishment of offenders, for offenses committed on board of American vessels, even in the ports and harbors of a foreign nation, by any one of the crew of such vessel. Congress therein assumes such offender to be within American jurisdiction, although beyond her territorial limits. We concede, however, the current right of such foreign power, to punish the offender, if the offense were committed against a citizen and the laws of such foreign power. To attempt to oust the jurisdiction of a foreign power, by the interposition of American jurisdiction, would be to make an innovation upon the laws and jurisdiction of such foreign power, which we admit we have no power to do. See the case of *Alexandrine Dussuan* determined in the State of Louisiana, to which reference is had in §§ 180–182, Story Confl. Laws.

2. But it is contended by the appellee that the law, in its operation beyond the State, is without vindication; that it may be violated, and the offender go unpunished, by reason of the fact that the violation of the law, the crime, is committed within the jurisdiction of another State, and that no State can take cognizance of or punish an offender for crimes not committed within her prescribed jurisdiction; that therefore the law is inoperative, void and unconstitutional. This is by no means a legal deduction, for we can easily conceive a law to exist, even a law expressly commanding or prohibiting some act, for the doing or neglecting of which no penalty is prescribed, and yet be in perfect harmony with both the letter and spirit of the Constitution, neither inoperative nor void; yet we confess that such a law lacks one of the essential elements of an effective statute. A law may prescribe what is right and what is ' wrong, and direct obedience, and though an offender go unpunished, it is none the less a law.

But the amendment to Title IV of the Revision of 1860

provides a punishment for persons voting contrary to the provisions of the law, and this punishment, it is insisted, cannot be enforced against persons violating the law outside of the State; but we insist that any person, a citizen of Iowa, and owing allegiance to the State of Iowa, assuming to act under and enjoy the provisions of this act of the Legislature, in any other State or jurisdiction, if not entitled to a vote, does so with an intention to violate the laws of the State of Iowa, and is punishable within her jurisdiction, whenever found therein, until which no Court can punish. This is the principle contained in the act of Congress passed March 3d, 1825, referred to above. The right of a State to punish for offenses committed beyond her prescribed limits is discussed at length in the case of *Adams* v. *The People*, 1 Com., 173, and goes much farther than is necessary in support of this case.

Justice BRONSON, in his opinion, distinctly enunciates and establishes two things: 1st, that, by virtue of the allegiance a subject owes to his State or nation, that State or nation has the power to punish offenses committed by the subject against her own laws, and beyond the territorial limits of that State; and 2d, that, no matter where the offender may have been when committing a crime against the laws of the State, directly, he is punishable in that State, whenever the authorities of that State can get jurisdiction of his person.

We do not insist upon the further and 2d principle laid down by BRONSON, J., for while we do not doubt its correctness, it is not essential in support of our case.

The right of a government to punish its subjects for offenses committed outside of its territorial limits is perhaps more fully and ably discussed in the case of *The People* v. *Tyler*, 7 Mich., 221, and though somewhat modifying the opinion of Justice BRONSON, fully covers this case.

III. Much has been said by counsel for the appellee,

during the progress of this case, touching the constitutionality of the law in question when viewed in the light of the policy of our State Government.

Our State Government and its policy are both derivable from the same source—the People. The Constitution of the State prescribes the boundaries of the State, how it shall be governed, who shall constitute its rulers and law makers, and how they shall be chosen; and, in fact, everything essential to its existence and administration. The Constitution, then, and the several powers by it created and provided for its administration, constitute and form the government; all this is derived from the people, and the policy of the government can come from no other source. It follows that the government, being the will of the people expressed in the shape of a Constitution and laws, made from time to time by their Legislature, such Constitution and laws must contain and express the policy of the government; and the policy is wholly derived from the letter and spirit of the Constitution and laws; and the spirit can be collected only from the natural and reasonable meaning of the letter.

Investigating this question in the light of a reasonable and fair interpretation of the language used in the Constitution, we find the policy of the law to be a guaranty to every man of his civil rights, and his protection in the full enjoyment of these rights; among which rights is the right of suffrage to every man of the requisite qualifications, unattended by any unconstitutional restrictions. This right is not guaranteed to the man who remains in the State more than the man who leaves it voluntarily on business, if the law making power, who have necessarily some discretion in such cases, deem it an act of policy to legislate for the latter; nor to the man who may remain safely fortified within the State, and his own county, more than the man who, impelled by the dictates of patriotism,

may voluntarily quit his residence to protect his nation's flag, and assist in achieving her conquests over an armed rebellion; but to all men of proper qualifications does this right extend. If, however, no positive restriction as to the place of voting exists; if the policy of the Constitution and government on this point is a matter of doubt (which, however, we do not admit), and is now about to be settled, we do insist that the condition of the soldier absent from his residence by a sense of duty and obligation to his government, not voluntarily absent, but detained from home by the military authority, furnishes ample and powerful reasons for settling the doubt in favor of the law.

And further, it is well settled that, unless the law is clearly at variance with the letter and spirit of the Constitution, the Court will reconcile the two. This, we believe, is the rule laid down in *The People* v. *Tyler*, 8 Mich., 333. The Court says that, "to warrant us in declaring the statute unconstitutional, we should be able to lay our finger on the part of the Constitution violated; and the infraction should be clear and free from reasonable doubt.

That some doubt exists as to the unconstitutionality of the voting law, even the counsel for appellee would concede. If so, this of itself is sufficient to warrant the Court in sustaining the law. But further, can the Court lay their finger upon the part of the Constitution violated? Certainly not. That a Court may be able to say they find a positive and clear infraction or violation of the Constitution, nothing must be left to inference. The conflict between the law and Constitution must be express, and obvious to the understanding. Then, in conclusion, we say, that, on investigation by the Court, we believe they will find that no conflict can exist between the Constitution, either in letter or spirit, and the law.

V. That, by examination of the authorities and decisions of election contests in the State of Pennsylvania,

and other States, the Court will find that those features of the Pennsylvania law, so objectionable to the learned Judge deciding the case, are entirely avoided by the framers of the Iowa Law; and that none of those decisions bear upon the case at bar, except that of Wisconsin, to which we ask especial reference, as peculiarly in point; and lastly, that, conceiving our case one full of merit and justice to our worthy soldiers in the field, justly entitled to a voice in the selection of those who shall manage the affairs of our government, make and execute our laws, to whom, should our cause be crowned with success, we, as citizens, will ever be under a weight of obligation, we submit the case, confident that in our view of the law we will be fully sustained by the judgment of the Court, reversing the opinion of the Court below.

*H. M. Martin* and *J. H. Murphy* for the incumbent, Springer.

In our argument we shall follow as closely as we can, and answer the points made, and reasons and authorities, if any are presented in the argument of appellant in support of the constitutionality of the act entitled, "An act to amend title four of the Revision of 1860, so as to enable the electors of this State in the military service to vote at certain elections," &c.

It is true, as stated by appellant's counsel, that the contesting Court only decided the law unconstitutional so far as it was intended to "operate extra territorially," and that this decision was affirmed by the District Court; but it is equally true, that the District Court, in its written opinion, held the law unconstitutional throughout.

It was not, and is not, conceded "on the part of appellee," as claimed by appellant, "that there is no conflict between the provisions of the law known as the soldiers' voting law and any express provision of the Constitution

of the State of Iowa, and that the only conflict claimed to exist is a conflict between the laws and an *implied provision*, section 1, of article 2 of the Constitution, *fixing the place of voting.*" But, on the contrary, we argued in the Court below, and still believe, this law to be in conflict with not only the spirit, but the plainly written provisions of section 1, article 2, and other sections of the Constitution.

The first proposition laid down by the learned counsel for appellant is, that section 1, article 2 of the Constitution, which provides that "every white male citizen of the United States of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the County in which he claims his vote sixty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law," only fixes the qualifications of an elector, and not the place of voting. As, for instance, " that he shall have been a white male citizen of the United States, twenty-one years of age, a resident of the State six months next preceding the election, and of the County in which he *claims his vote* sixty days "—are only qualifications of which an elector must be possessed before voting, and have no reference to the place where he shall vote.

There are two well-established principles of constitutional law applicable to this section of our Constitution and adverse to the construction given by appellant, to wit:

1st. " When the means for the exercise of a power are given in a Constitution, no other or different means can be employed." 1 Kent Com., 515.

2d. " Affirmative words used in a Constitution imply a negative as strongly as if such negative words were used." 1 Kent Com., 461 ; *The District Township of The City of Dubuque* v. *The City of Dubuque*, 7 Iowa, 276.

As to the first proposition, are not the means for the exercise of the right or " power " of voting fully given in

section 1 of article 2? and among the means thus pointed out, is there not one which most clearly designates the place of voting to be "*in the County in which the voter claims his residence.*"

As to the second proposition or principle of constitutional law, there can be no doubt that the affirmative description of a voter contained in section 1, of article 2, both as to person and place, implies a negative as to all not coming within it. A white male person of the age of twenty-one years, &c., may vote. It is at once conceded that a negro or black person, though twenty-one years old, cannot vote; and yet this fact only exists as a negative result. It is also readily admitted that a female, though white, twenty-one years old, and a citizen of the United States, cannot vote notwithstanding the word female is not used.

So it is in respect to the place of voting. The same reasoning holds good. The affirmative description of the place of voting implies a negative to all other places not mentioned. The claiming his vote in the County of his residence, which is the literal meaning of the words, "shall have been a resident of the County in which he claims his vote sixty days," as readily implies a negative as does the word male or white, and is just as essential to the perfect idea of a voter as that he be a male and white.

The right of voting is a prescribed, and not a natural right; and being a prescribed right, all who exercise it must place themselves within the perfect meaning of the prescription; and not being a natural right, the incidents of citizenship, "residence in the county," and claiming his vote therein, do not inhere in the person of the voter as do those of age and color, and yet, under the Constitution, are equally as essential to the completion of a perfect and finished elector.

On an examination of the constitutional debates, it at once becomes apparent that it was not only the intention

of the framers that the voter should be personally present in the county of his residence at the time of voting, but that this fact was so generally conceded that it was passed by as a matter of course, with but little, if any, discussion bearing directly on the question that in this respect the safety and purity of elections were secure. As this section first came from the committee, a residence of twenty days in the county was required. 2d vol. Debates, 859. A motion to amend so as to require a residence of six months in the county, was at once made and lost by a small majority. 2d vol. Debates, 859. On this proposed amendment, a lengthy discussion was had, all agreeing on the one question, to wit: "the necessity of protecting and securing the purity of the *ballot-box*."

But this question, if question it ever was, has been too well settled by the highest courts of other States to need any further argument from us. In the case of *Chase* v. *Miller*, 146 American Law Register, the Supreme Court of Pennsylvania says, in construing the section of the Constitution which reads: "In elections by the citizens, every white freeman of the age of twenty-one years, having resided in the State one year, and in the election district where he offers to vote, ten days immediately preceding such election, and within two years paid a State or county tax, which shall have been assessed at least ten days before the election, shall enjoy the right of an elector." Regarding the amendment as designed in general to exclude fraudulent voting, the question now is, what construction shall be given to its particular phraseology? Construing the words according to their plain and literal import (and we presume that the people of Pennsylvania construed them so when they adopted the amendment), they mean, undoubtedly, that the citizen possessing the other requisite qualifications is to have a ten days' residence in an election district, and is to offer his ballot in that district. The second section

of this article requires all popular elections to be by ballot. To "offer to vote" by ballot is to present one's-self, with proper qualifications, at the time and place appointed, and to make manual delivery of the ballot to the officers appointed by law to receive it. The ballot cannot be sent by mail or express, nor can it be cast outside of all Pennsylvania election districts and certified into the county where the voter has his domicile. We cannot be persuaded that the Constitution ever contemplated any such mode of voting; and we have abundant reason for thinking that to permit it would break down all the safeguards of honest suffrage. The Constitution meant, rather, that the voter, in *propria persona*, should offer his vote in an appropriate election district, in order that his neighbors might be at hand to establish his right to vote, if it were challenged, or to challenge it if it were doubtful.

The amendment, so understood, introduced not only a new test of the right of suffrage, to wit : a district residence, but a rule of voting also. Place became an element of suffrage for a two-fold purpose.

Without the district residence no man shall vote ; but having had the district residence, the right it confers is to vote in that district. Such is the voice of the Constitution. The test and the rule are obligatory. We have no power to dispense with either. Whoever would claim the franchise which the Constitution grants, must exercise it in the manner the Constitution prescribes.

But it is insisted, by counsel for appellant, that there is an obvious distinction between the two Constitutions in this respect. That to " offer to vote in a county " and to " claim to vote in a county " are quite dissimilar in meaning. The former, say they, in the language of WOODWARD, " is to present one's-self, with proper qualifications, at the time and place appointed, and make manual delivery of the ballot to the officers appointed by law to receive it.

The latter is to assert a right to vote, unaccompanied by an intention to vote."

To claim, is to demand a thing as due. In order, then, that the right of voting should be due to an elector, does it not follow as a necessary sequence, that he, with the proper qualifications, should present himself at the proper time and place, in order to receive it?

In the able opinion of the Supreme Court of Connecticut, on the constitutionality of a similar law, reported in the American Law Register of June, 1863, p. 460, will be found that the clause of the Constitution of that State, relating to the place of voting, is much more open to doubt than ours; yet the full bench unhesitatingly pronounced the law in this, as well as in many other respects, unconstitutional.

The language of that constitution, on the question of place, is this, to wit: "In an electors' meeting, composed of the electors in the several towns duly warned, convened, organized and held for that purpose, certain officers shall be elected," &c.

The Court, on the question of place, says: "The act is not an exercise of any power claimed to be expressly delegated, or an implied power to supply needed and omitted details in aid of a general provision of the Constitution and in harmony with it; but it authorizes an election to be holden at another and different place than that which the people by their supreme will have specifically and fully prescribed, by military instead of civil officers, and in derogation of the constitutional safeguards incident to place prescribed in the paramount law. It is therefore manifestly repugnant to a plain and imperative provision of the Constitution, unauthorized and nugatory."

"If the General Assembly can thus add to, alter and control one constitutional provision respecting elections, there are no others beyond their reach. They may direct

votes to be taken at any time, and say that they shall be considered, held and taken to have been cast on the first Monday of April. They may authorize minors to vote, and say that their vote shall be considered, taken and held to be the votes of electors of full age; or colored men, and say that their votes shall be considered, taken and held to be the votes of white men and electors; and so may authorize the taking and counting of the votes of women and aliens. Nor would there remain any other matter of constitutional provision or purpose which might not be reached at any time by a temporary and fluctuating legislative majority, and by the same legislative alchemy of changing things constructively into what they are not in fact, be practically controlled or annulled. Indeed, the same process which could turn votes taken in a camp to votes taken in electors' meeting, might turn those taken in fact in the electors' meeting into the votes of women, or aliens, or minors, or colored men, and exclude them for that reason from the canvass; and so on, till the Constitution and con·stitutional law becomes a mockery.

"Nor can it with truth or safety be said, that although the Constitution prescribes a certain place where votes may be cast, it does not prohibit their being cast in any other place. Neither in constitutions, nor statutes, nor contracts, nor wills, nor in any oral directions of a superior to an inferior, as a master to a servant, or a parent to a child—do men deem it necessary to accompany an express and full direction to do a particular thing in a particular way, by an express direction not to do it in any other. · Officers, civil and military, citizens, servants, and children, all understand that every such direction of a superior carries with it an implied prohibition against doing the things prescribed in any other way."

Also, a similar doctrine is laid down in the opinion of the Supreme Court of New Hampshire. ` The Constitution

of that State has no specific provision as to the place of voting, as have the Constitutions of the States before referred to. Nevertheless, the full bench concurred in holding such a law unconstitutional. It says: "By the common law in elections of public and municipal corporations, and in all other public elections, every vote must be personally given," (citing numerous authorities.) That, "as the language of the Constitution is to be understood in the sense in which it was used at the time of its adoption; and as at that time, both by the common law and by the settled usage here, the right of voting for public offices was a right that must be exercised personally by the voter, at the meeting held for the purpose, it follows that if no different provision is made in the Constitution, the right of suffrage established by it, is to be exercised by the voter in person at the meeting duly held, within the district, for that purpose."

The question now under consideration counsel for appellant dismiss by saying that it has been fairly raised and settled by the Supreme Court of Wisconsin, and settled, too, in their favor. Such is not our understanding of the opinion. It is true, the Court held the law of that State authorizing electors in the military service to vote, to be constitutional, but did so on the ground that the constitution of their State was to all intents and purposes silent as to the place of voting. On this the Court say, in the outset of their opinion:

"He claims it to be unconstitutional; but, with the exception of one clause, which will be hereafter specially noticed, it is conceded that there is no provision of the Constitution which attempts to prescribe where the right of suffrage shall be exercised, or to prohibit the Legislature from authorizing it to be done outside of the limits of the State."

Here are the section and comments of the Court: "As

has already been said, with one exception no clause of the Constitution was relied on as amounting to a prohibition." That exception related to section 5, article 13, which is as follows: "All persons residing upon Indian lands within any county of the State, and qualified to exercise the right of suffrage under this Constitution, shall be entitled to vote at the polls which may be held nearest their residence, for State, United States or county officers; provided that no person shall vote for county officers out of the county in which he resides." •

The Court then say, speaking of the proviso: "Did it mean to prohibit any voter from ever being allowed to cast his ballot outside of the county in which he resides, though voting for officers of such county; or did it mean only to prohibit any voter from voting for the county officers of a county in which he did not reside? It seems to me, obviously the latter. In the first place, had the framers intended to enact any general provision confining the right of voting to any particular place, it would naturally have been invested as a distinct provision in connection with the article on suffrage."

In the Constitution of Iowa, we have that district provision, and have it, too, where the Supreme Court of Wisconsin say they would naturally expect it, in the article on suffrage.

II. Can a law operate extra-territorially? If not, is not the law in question unconstitutional and void?

It is a well established principle that the laws of one State or nation can have no intrinsic force *proprio vigore*, except within the territorial limits and jurisdiction of the country enacting them. See Story on Confl. Laws, §§ 7–10, 17–28; Bouv. Inst., § 102, pp. 47, 83.

A law of Iowa, in itself, has no force or effect in another State. 6 Iowa, 425. Its force in another State is a matter of comity, and extended not by the courts of the State in

which the law was passed or enacted (of this State), but by the courts of the State in which its mandates are sought to be enforced.

Boullenois has laid down the following among his general principles. In commenting on the extra-territorial force of a law, he says:

" He or those who have the sovereign authority have the sole right to make laws, and these laws ought to be executed in all places within the sovereignty where they are known, in the prescribed manner. The sovereign has power and authority over his subject, and over the property which they possess within his dominions. The sovereign has also authority to regulate the forms and solemnities of contracts which his subjects make within the territories under his dominion, and to prescribe the rules for the administration of justice. The sovereign has also a right to make laws to govern foreigners in many cases. For example, in relation to property which they possess within the reach of his sovereignty ; in relation to the formalities of contracts which they make within his territories; and in relation to judiciary proceedings, if they institute suits before his tribunals. The sovereign may, in like manner, make laws for foreigners who even pass through his territories ; but these are commonly simple laws of police, made for the preservation of order within his dominions; and these laws are either permanent or they are made only for certain particular occurrences."

Another maxim or proposition is, that no State or nation can, by its laws, directly affect or bind property or persons out of its own territory. To do so, Story says (see Conflict of Laws, section 21), would be equivalent to a declaration that the sovereignty over a territory was never exclusive in any nation, but only concurrent with that of all nations; that each could legislate for all, and none for itself.

Accordingly, Rodenburg has significantly said : " That no sovereign has a right to give the law beyond his own dominions; and if he attempted it he may be lawfully refused obedience, for wherever the foundation of law fails, there their force and jurisdiction fails also. Story, Conflict of Laws, 21.

And here we might say that the sovereignty of the State of Iowa is confined to its own territorial bounds, and that its laws can have no force and effect beyond its territorial limits.    Section 30 of article 3 of the Constitution provides that " all laws shall be general and of uniform operation throughout the State." The preamble to the Constitution tells us what the limits of the State are, and, of course, by reason of the maxim that " an affirmative implies a negative to all not embraced," under the section of the Constitution just quoted, no extra-territorial force can be given to a law of this State.

The vindicatory is the strongest of the essentials of a law. Can that part be applied to the soldiers' voting law, and made to operate beyond the limits of the State? If not, then it is no law at all; for, without any other reason, it would fall within the general and frequently recognized principle, that " where an act is passed containing some provisions which might be valid and others which are void, and those which are void were designed as compensation for, or qualification of, the others, so that the Court can say, upon looking at the whole statute, that the Legislature would not have passed the valid parts, except upon the supposition that the void parts could be enforced also—the whole act must fail."

But aside from this, which, in the present case, ought to be sufficient, section six of the amendments to the Constitution of the United States provides: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the *State* and *district*

wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature of the accusation," &c.

The soldiers' voting law proposes that a crime may be committed in the State of Texas or Tennessee, and the criminal transported to the State of Iowa for trial and punishment.

But, the question recurs, can the vindicatory part of the soldiers' voting law have force and effect beyond the limits of the State? We think not. Not even within the limits of the State as against those who are in the actual military service, as the doctrine is quite well established that the military and civil powers of our government are separate and distinct departments. "Civil Courts have no control over crimes committed by persons in the military service." Note, 1 Kent Com., 369. In note to 1 Kent, 44, the following doctrine is laid down:

"It is a decided and settled principle in the English and American law, that the penal laws of a country do not reach, in their disabilities or penal effects, beyond the jurisdiction where they are established." *Falleatt* v. *Ogden*, 1 H. Blacks., 123–135; Lord ELLENBOROUGH, *Wolff* v. *Oxholm*, 6 Maule & Selw., 99; *Commonwealth of Massachusetts* v. *Green*, 17 Mass. R., 514–539–543; *Scoville* v. *Camfield*, 14 Johns. R., 338–340; *The State* v. *Right*, Taylor's N. C. R., 44.

Another ground of contest, and one not noticed in the argument of appellant, is that the votes cast beyond the limits of the State were received by persons acting as Judges and Clerks unauthorized, by reason of their not having been sworn as required by the Constitution of the State. Section 11 of the act authorizing soldiers to vote, provides only for an "oath of office," while section 5 of article 11 of the Constitution requires every person elected or appointed to an office, "before entering upon the duties

thereof, to take an oath or affirmation to support the Constitution of the United States and of this State, and also an oath of office," and also, as the law had no force or effect beyond the State, no oath of any kind could be administered by officers acting under it.

And in conclusion the learned counsel deprecates a construction that shall tend to disfranchise the soldiers, and appeal to the Court in behalf of the justness of their cause, with as much assurance as if the Court was composed of popular sympathies, and liable to be moved by popular prejudice and passion. As said by the learned Judge WOODWARD, " The Constitution would disfranchise no qualified voter. But to secure purity of elections, it would have its voters in the place where they are best known, on election day. If a voter voluntarily stays at home, or goes a journey, or joins the army of his country, can it be said that the Constitution has disfranchised him? Four of the Judges of this Court, living in other parts of the State, find themselves on the day of every Presidential election, in the city of Pittsburg, where their official duties take them, and where they are not permitted to vote. Have they a right to charge the Constitution with disfranchising? Is not the truth rather this, that they have voluntarily assumed duties that are inconsistent with the right of suffrage for the time being?

" Such is our case, and such is the case with the volunteers in the army. The right of suffrage is carefully preserved for both them and us, to be enjoyed when we return to the places which the Constitution has appointed for its exercise."

It is certainly forcing a strong and gratuitous assumption upon the Constitution to treat it as intending that the volunteer in the public service shall carry his elective franchise with him wherever his duties require him to go; and a still stronger assumption upon an " an independent judiciary,"

venerable by its gravity, its dignity, and its wisdom — to treat it as in conscience and duty bound to maintain this law, because it carries with it the indorsement of popular favor.

In the consideration of this case, let it be remembered that a law with us must conform in the first place to the Constitution of the United States, and then to the Constitution of the State of Iowa; and, if it infringes the provisions of either, it is so far void.

That Courts of Justice have a right, and are in duty bound to bring every law to the test of the Constitution—first, of the United States, and then of their own State—as the paramount power to which every inferior or derivative power must conform.

That the Constitution is the act of the people, speaking in their original character and defining the permanent condition of the social alliance.

*Thomas S. Wilson* and *John H. O'Neill*, *pro se*, with *W. J. Knight*.

I. Chapter 37, Rev. of 1860, does not provide any means for contesting the offices of District Judge and District Attorney.

II. The act allowing soldiers to vote is unconstitutional, citing the cases cited to sustain the same proposition, *supra*.

*D. E. Lyon* for the incumbent Burt, submitted a printed argument discussing the constitutionality of the law under which the volunteers from the State exercise the right of suffrage.

*Bissell & Shiras* for the incumbent Watson.

I. The Court did not have jurisdiction to hear this cause:

1. Exclusive jurisdiction to contest the election of certain officers, including that of District Attorney, is provided for in chapter 37, title 4, of the Revision of 1860. *The*

*Commonwealth, ex rel. Ross,* v. *Baxter,* .35 Pa. S., 263; *The State, ex rel. Brison,* v. *Singe,* 26 Mis., 500; *The People* v. *Van Dyck,* 4 Seld., 81.

2. Watson, the defendant, holds the regular certificate of election, and his right cannot be contested in this action, because he is not unlawfully holding the office.

3. J. H. O'Neil, the relator, has no right to institute and prosecute this proceeding, as he did not take the oath of office and file the bond required by law, and is not entitled to hold the office, even if Watson is not legally elected nor entitled to the office.

4. The information is filed upon the information of J. H. O'Neill, and it does not allege that the District Attorney of the 9th Judicial District, on demand, neglected and refused to file such information, as the petition avers, that George Watson was not the District Attorney; and if Watson was not the District Attorney, the former District Attorney, W. T. Barker, held over until his successor should be elected and qualified.

II. The act of the General Assembly of the State of Iowa, approved September 11th, 1862, is constitutional.

WRIGHT, J.—In the second and third case, it is claimed by the appellees and incumbents that the proceedings should have been instituted under chapter 37 of the Revision, and that, as that chapter prescribes the only method for contesting elections in this State, the information should have been dismissed. Appellants, on the other hand, claim that the offices of District Judge and Attorney are excepted from' the provisions of the chapter, or, if not, that they have a right to pursue either remedy—that is, to be heard before the tribunal to be organized under said chapter, or by information filed under chapter 51. If it shall be determined that the incumbents are entitled to the offices, the examination of the question here made will

become unnecessary. It is, therefore, passed for the present, that we may consider the other and cardinal question, one that arises in all the cases. And this involves an inquiry into the constitutionality of the act of the General Assembly of this State, approved September 11, 1862, entitled "An act to amend Title 4 of the Revision of 1860, so as to enable the qualified electors of this State, in the military service, to vote at certain elections."

By this act it is declared, that every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State six months, and of some county therein for sixty days next preceding his enlisting in the military service of this State or of the United States, shall be entitled to vote at all elections authorized by law, as provided therein, whether at the time of voting he shall be within the limits of this State or not. It is also provided that a commissioner shall be appointed to each regiment of Iowa volunteers, for the purpose of carrying out said act. Such commissioners are to be sworn, and are required to·deliver poll books and copies of the law to commanding officers, and to make suitable provision and arrangement for opening the polls and conducting the election. A poll is to be opened at every place, whether within or without the State, where a regiment, battalion, battery or company of Iowa soldiers may be found or stationed, at which all persons may vote who are thereto entitled by law and the provisions of said act, said voting to take place on the day fixed for holding the general election, to wit: the second Tuesday in October in each year. Provision is made that every regiment and company on detached service shall have the opportunity of voting. The electors present are authorized and required to choose three judges of election, and these judges appoint the clerks. Each of these officers is required to be sworn. In addition to these provisions, in connection with the act

amended (which is declared applicable), the duties of the officers of elections — the method of making the returns — the right to administer oaths to electors — the penalty for false swearing or illegal voting — for a violation of duty on the part of the commissioner — and all other matters to make the act effective and have it properly executed, are clearly, fully and distinctly pointed out.

It is claimed by the contestants that this act is in conflict with section 1, article 2 of the State Constitution, which reads as follows:

"Every white male citizen of the United States, of the age of twenty one-years, who shall have been a resident of this State six months next preceding the election, *and of the county in which he claims his vote* sixty days, shall be entitled to vote at all elections which are now or may be authorized by law."

Other States have passed, or proposed to pass, acts having in view the same object as the one under consideration. Some of these are referred to by counsel, and others have been examined by us, and it will be our first business to see how far they assist the solution of the questions involved.

The Constitution of Connecticut provides that the place of holding elections shall be in an electors' meeting, composed of the electors in the respective towns qualified to vote in the town, duly warned, convened, organized and held for that purpose. Constitution of 1818, and amendments of November, 1836, and October, 1845. And under this Constitution it was held, we think most properly, and, we may add, in an opinion remarkably clear, plain and able, that it was intended that the vote should be brought in by the elector in person, in an organized electors' meeting, in the presence of the electors, and there received by the presiding officer. Opinion by Butler, J., 2 Am. Law Reg.

(N. S.), 460. With the reasoning of this case we may have more to do hereafter.

The Constitution of New Hampshire is even more explicit as to the place of voting, to wit: in an electors' meeting, duly warned and holden, where the votes of the inhabitants are to be received in the presence of the select men in open meeting. And under this it was held that the right of suffrage was to be exercised by the elector in person, at the meetings duly held for that purpose, and that this right could not be exercised by or through an agent or attorney, in the manner contemplated by a proposed act of the General Assembly; for the provisions of which, and the reasoning of the judges, see 2 Am. Law Reg. 2 (N. S.), 140. This conclusion, we remark, is not only clearly warranted by the Constitution, but by the common law principle that in all public elections every vote must be personally given — a principle which, under our form of government, is not only well recognized, but of vital practical importance.

The Constitution of Wisconsin, § 5, art. 13, declares that: "All persons residing upon the Indian lands, within any county of the State, qualified to exercise the right of suffrage under this Constitution, shall be entitled to vote at the polls which may be held nearest their residence, for State, United States or county officers; *provided that no person shall vote for county officers out of the county in which he resides.*" Under this it has been held that the proviso did not mean to prohibit the voter from being allowed to cast his ballot outside of the county in which he resided, but to prohibit him from voting for officers of a county in which he did not reside. See *State, ex rel. Chandler,* v. *Main* (MSS. Op. Sup. Court, Wisconsin, March, 1863.)

In Pennsylvania the constitutional provision is, that: "In all elections by the citizens, every white freeman of the age of twenty-one years, having resided in this State

one year, and in the election district where he offers to vote ten days immediately preceding such election * * * shall enjoy the right of an elector." Amended Constitution, § 1, art. 3. WOODWARD, J., in the case of *Chase* v. *Miller* (2 Law Reg., 146), in what must be admitted to be a very able and almost exhaustive opinion, holds that the law allowing soldiers to vote outside of the boundaries of the State is in conflict with this section of the Constitution, and is therefore null and void.

So far as we know, these are the only decisions bearing upon the question now before us. And in view of the constitutional provisions of these several States, we hazard nothing in saying that neither of them (unless it may be Pennsylvania) are so so far analogous to our own as to make the decision controlling as authority. In prescribing the time, place and manner of conducting elections, the Constitutions of the several States differ. " In some, " in the language of the case above cited from Connecticut, "all are prescribed with that particularity which forbids all action by the Legislature. In others neither are prescribed, but the qualification required of the voter is fixed, and the power to regulate the time, place and manner committed to the Legislature." Thus in Louisiana it is declared that: " No person shall be allowed to vote at any election held in this State, except in the parish of his residence, and in cities and towns divided into election precincts, in the election precinct in which he resides." Const. 1852, tit. 2, art. 3.

To the same effect is the Constitution of Kentucky, which declares that the elector shall have certain qualifications, and "shall vote in said precinct (that of his residence) and not elsewhere." Const. of 1850, art. 2, § 8.

A similar provision is contained in the Constitution of Illinois, article 6, section 1. The Constitution of Michigan 1850, article 7, section 1, Ohio 1851, article 5, section 11, and California 1859, article 2, section 1, on the other hand,

contain no such express provisions or restrictions, and are not so entirely unlike our own.

These brief references to some of the State Constitutions but serve to show how true it is that each State regulates the elective franchise for itself, and that the Legislature thereof is left more or less free, or is more or less restricted by the fundamental law. We suppose it to be a proposition which will not be denied, that where the time, place and manner of holding elections are not prescribed by the Constitution, but committed to the Legislature, the reception of votes out of the precinct or county of the elector's residence may be constitutionally authorized. It is expressly so held in the case above cited from Connecticut, and this ruling certainly accords with the object and purpose of a State Constitution, and the powers well understood to be possessed by the Legislature; for the Constitution, as applied to the legislative department, is a limitation and not a grant of power. Or, in other words, if the Legislature is not restricted, it has full power to provide who shall have the right of suffrage, and prescribe the time, place and manner of its exercise; for the Legislature clearly has the power to legislate on all rightful subjects of legislation, unless expressly prohibited from so doing, or where the prohibition is implied from some express provision. This theory must never be lost sight of by courts in examining the powers of the Legislature. It is elementary, cardinal, and possesses frequently controlling weight in determining the constitutional validity of their enactments. Where the prohibition is express, of course there can be no exercise of power. So where it is necessarily implied from some express provision, the law-making power cannot interfere.

In either event the Constitution is to be taken as a clear and full mandate, and the Legislature cannot change, extend or control its meaning. Thus, if the Constitution declares

that a thing shall be done in a particular manner or way, it is implied necessarily that it shall not be done in any other. To illustrate: if it declares that the votes of the electors shall be cast at a particular place, it is not necessary to prohibit by express words their being cast at any other. But if there is no such express declaration, and none fairly to be implied, it is within the power of the Legislature to fix the place. And this we repeat, upon the principle that the General Assembly possesses all legislative authority not delegated to the General Government or prohibited by the Constitution. We need hardly remark, to avoid misapprehension, that this general statement of the proposition has no reference to the rights retained by the people as contemplated by the last clause of the first article of the Constitution; for an exposition of which, see *The State ex rel.* v. *The County of Wapello,* 13 Iowa, 388.

In view of these authorities and general principles, what construction shall be given to the provision under consideration? It is observable that the Constitutions of some of the States, and especially the Western States, contain very different language from that found in States East and South. Thus, in the States of Connecticut and New Hampshire, a "town meeting" is contemplated, the electors are warned to be present, and their votes are to be cast there in the presence of the selectmen; or, as it is expressed in the Constitution of Massachusetts, the votes are "to be given in" at such meeting to the selectmen so presiding. In most of the States South, and some of those West, while no "town meetings" are provided for, it is clearly and expressly declared that the elector shall not be entitled to vote except in the county in which he may reside at the time of the election. In addition to those already cited, see Alabama, article 3, 585. In such cases there could remain no reasonable room for controversy, for the affirmative words imply a negative so strongly that the use of negative words was

unnecessary; or, in the language of Chancellor KENT, the means for the exercise of a power (or right) are so clearly given or prescribed, that no other or different means could be employed. 1 Com., 515.

The Constitution of this State is not, however, so explicit. There is certainly no express provision like that found in Alabama and the other States referred to, prohibiting the exercise of the right except in the county of the elector's residence. If no express prohibition, is any necessarily implied?

It is not claimed, nor could it well be, that soldiers in the volunteer service of the Government, by their absence, have lost or changed their residence. It still remains, unless changed by some other act, in the county of their residence at the time of entering the service. If at home, or in the county of their residence, on the day of election, they would unquestionably have the right to vote, if otherwise qualified. Thus far, therefore, there is no difficulty. The inquiry, then, is, whether the Constitution fixes the place of voting (in the county) as a test of qualification, or whether it gives the qualification, and leaves the place of voting to the Legislature.

And the argument is legitimate that, as our Constitution differs from those of other States, there was an object in the phraseology employed. For, when it is remembered that very many States had, before 1857, by their Constitutions, used such express and clear language prohibiting the exercise of the right out of the county or precinct of the voter's residence, and that our convention had the benefit of such provisions and rights, it is fair to presume that the same or similar language would have been used, if it had been intended to fix the same qualification. The words of the Constitution furnish the test to which the statute is to be brought, and generally all arguments derived from general principles must be addressed to the Legislature or the

people, and not to us. 21 Penn. St. R., 162. And when we find two instruments upon a given subject, one of which clearly forbids the doing of an act or the exercise of a power, while the other contains no such express prohibition, but at the utmost can only be claimed to do so by implication, the fair and legitimate inference is that the words of the latter were not intended to have the same force and effect as the former. And this is especially true when the latter is made subsequent to and in the light of the former.

But in further examining the very words of the Constitution, let us, if we can, arrive at their meaning. The leading object undoubtedly was to define who should be entitled to vote. *First.* He was to be a white male citizen of the United States. *Second.* Of the age of twenty-one years. *Third.* A resident of this State six months next preceding the election. *Fourth.* A resident of the county sixty days. Now, if it be admitted that the incidents of residence in the State and county inhere in the voter, in the sense that sex, age and color inhere in the person as well as the voter, it by no means follows that the Legislature might not fix, at its discretion, the place where those to whom these incidents attach, or possessing these qualifications, may exercise the right; for it is admitted that when the Constitution says "white male citizens," it negatives the right of the Legislature to confer the elective franchise upon females or persons of color. So when it prescribes a residence in the State six months, and the county sixty days, it equally prohibits the conferring the right upon those having a residence of three months and of twenty days. If nothing was said about residence, it would be entirely competent for the Legislature to fix it at one day or five years. But the Constitution, in the language used, intended to declare who should enjoy the right of suffrage, rather than where it should be exercised, and the incident

of place, or the place of exercising the right, is not attached as a qualification of the voter.

It is said, however, that he must claim his vote in the county of his residence; that he cannot vote unless, in the language of the Constitution, he is a resident "of the county in which he claims his vote," and that this necessarily limits the place of the enjoyment of the right. The foregoing views, to some extent, answer this proposition. But we remark further, that the words of the instrument must not be forgotten, added to or "changed." What weight should be given, then, to the word claims? Does the assertion of this right, or a claim to exercise it, constitute any part of the qualifications of the voter? In other words, if he is of the right age, sex and color, and has the requisite residence, is he not a qualified voter, though he may not claim to exercise that right? If so, then how can the claim of a right, already perfect, add to its completeness? or how can the place of asserting it figure in the qualifications? Not only so, but to claim a thing is to demand a right, or a supposed right. When the right is asserted, it is claimed, though it may not be granted. It may be asserted by words, or other means. Etymologically, it by no means implies that place or presence are essential to its potency or completeness. On the other hand, to "offer" to do a thing is to bring to or before — to present for acceptance or rejection — to exhibit something that may be taken or received or not. And hence the argument drawn from the case in Pennsylvania is not by any means conclusive; for while, in the language of WOODWARD, J., it may be true that to "offer" to vote by ballot is to present one's-self, with proper qualifications, at the time and place appointed, and make manual delivery of the ballot to the officers appointed by law to receive it, it by no means necessarily follows that the same would be the meaning of the word "claims" as used in our Constitution. The one

does not imply so conclusively as the other the idea of a personal presence in order to assert the right. But aside from this, we must not forget that the language is not that the voter must claim his vote in the county, but, in speaking of residence, says that it must be in the county sixty days. And the person cannot claim to be an elector in any other county than where he has such residence. This, in substance, is what is meant by the word. "claims." If more had been meant, or intended, it seems to us that other and different language would have been used.

But let us suppose there is doubt as to the correctness of the above construction—then what is our duty in the premises? The law has been passed by the Legislature, a co-ordinate branch of the government, acting under like solemn obligations and responsibilities with ourselves—has been approved by the Executive, who has taken a like oath to support the Constitution,—and we are now called upon to declare it invalid. If it is so, in our judgment,—that is, if we conclude that the infraction is clear, palpable and plain —then most unquestionably it is our duty to so declare.

On this subject, no court should seek or desire to escape responsibility. The Constitution should be expounded as it is found, and never bent or warped to meet any public exigency. All branches of the government, but courts especially, for the welfare and perpetuity of the government, should carefully and strictly adhere to its letter and spirit.

But while this is all true, while we would, as we have heretofore done, most unhesitatingly declare invalid any law, which in our opinion was clearly obnoxious to the provisions of the Constitution—and while we may be permitted to say that we trust that this power may, in proper cases, be exercised by the courts fearlessly, independently yet always wisely, we cannot forget that among the fundamentals of the law, almost, is the proposition, that " we can declare an act void only when it violates the Constitution,

clearly, palpably, plainly, and in such manner as to leave no doubt or hesitatión on our minds." 21 Penn., 162. Lest this may be regarded as stating the rule in too strong language, we refer to *Adams* v. *Howe*, 14 Mass., 345, where it is said, that the court when called upon to decide the constitutional validity of a law, will presume in its favor until the contrary clearly appears. "So that in any case substantially doubtful, the law would have its force. * * * And the court will never declare a statute void, unless the nullity and invalidity of the act be placed, in their judgment, beyond a *reasonable doubt*." So, in Kentucky, it is held, that if it be doubtful or questionable whether the Legislature has exceeded its limits, the judiciary cannot interfere, though it may not be satisfied that the act is constitutional. 2 Monr., 178. And to the same effect are the following cases as well as many others: *City of Lexington* v. *McQuillan's Heirs*, 9 Dana, 514; *Griffith et al.* v. *Ohio and Indiana R. R. Co.*, 20 Ohio (appendix, 1); *Cooper* v. *Talfair*, 4 Dall., 14; *The State of Iowa ex rel. Weir*, v. *The County Judge of Davis County*, 2 Iowa, 280; *Telfair* v. *McGin*, 1 Gray, 1; *Tyler* v. *The People*, 8 Mich., 333.

In view of this well-settled rule, recognized in the foregoing cases, we feel entirely satisfied as to our duty in the present case. There is certainly a substantial doubt. It is certainly true that we cannot, with conclusive satisfaction, place our finger upon the language of the Constitution which is clearly and palpably violated (5 Mich., 251), and though we might not be satisfied of its constitutionality, yet if not satisfied of its unconstitutionality, it is, our duty to uphold the law. And this view we present, because the law, the power possessed by courts, the whole current of adjudications, the frame-work of our State government, render it eminently just and sustainable, and with no disposition to shrink from the discharge of duty. As no court should fail, in a proper case, to pronounce against the

validity of a law when necessary, neither should it by metaphysical doubts and difficulties defy and overrule the public will, by showing that the power exercised by the Legislature was or might be questionable.

The foregoing considerations dispose of the body of the case. Other parts of it, or points made, are but arguments adduced to show the unconstitutionality of the act, the inexpediency of such legislation, or corollaries from the preceding or main proposition. The length of this opinion forbids that we should examine them in detail.

Briefly we remark, however, that with the expediency of the law we have nothing to do. It is sufficient that the Legislature has declared this as a part of the public policy of the State.

As to the thought that the convention framing the Constitution never contemplated or "dreamed " of authorizing a ballot to be taken outside of the State, we refer to what has already been said, and to the opinion in the Wisconsin case above cited. The argument is there placed in a clear, and to our minds, satisfactory form, and we could not hope to add to its conclusiveness by further elaboration.

But it is also urged that the law has an extra-territorial operation, that the laws of a State can only have operation within its limits, and that as this law provides for the organization of election boards, the holding of an election, the administering of oaths beyond the State, or within the jurisdiction of other tribunals, and for the punishment of illegal voting and false swearing in such elections, it is necessarily invalid.

We are not aware that any of the cases cited and relied upon by counsel intimate that a law of this character would be invalid for the reasons stated. On the contrary, one of them, at least (the Connecticut case), as we have already seen, expressly holds that if the time, place and manner are committed to the Legislature, the reception of votes out of

the State may be constitutionally authorized. Not only so, but the law is intended to act upon, and give a rule for the government of the citizens, residents or subjects of the State, though they may be out of the State, upon a subject and in relation to a matter which concerns and affects them as such citizens or subjects, and which affects also the sovereignty of this State and in no manner concerns any other jurisdiction. That persons violating the law cannot be punished until they come or are brought, without violation of the rights of another sovereignty, within the territorial jurisdiction of this State, avails nothing, for, as is well said by Bronson, J., in *Adams* v.*The People*, 1 Com., 178, this is no more than happens when a criminal escapes after having committed a crime within the State. Jurisdiction, of the offense or subject matter, is a very different thing. And upon this subject, see also *Tyler* v. *The People*, 7 Mich., 162 ; 8 Id., 320; 3 Denio, 190.

But suppose no penalty was provided for false swearing or illegal voting; or that those, if any, guilty in these respects cannot be punished, ·does it therefore follow that in a proceeding of this character, we would be justified in declaring the entire act void ? If the Legislature, in the general election law, should fail to provide a penalty for illegal voting, would the result be that the act should have no operation, and that all the votes cast would be illegal ?

It seems to us most clearly not. Then, again, in what does such legislation differ from those acts found in all the States, authorizing the appointment of commissioners abroad to take depositions, acknowledge deeds, and the like ; as also the taking of depositions in other States, to be used in our courts ? Can those swearing falsely in such cases, be pun· ished in this State ? If not, is the testimony therefore to be rejected. This has never been the holding of any court to our knowledge.

Looking, therefore, in conclusion, to both the letter and

spirit of the Constitution, only anxious to view the question as one of legal or constitutional right, discarding all thought of expediency, all considerations touching the justice of the law, as anxious as any other tribunal, that "a free and honest suffrage" shall alone be provided for and sustained, keeping in view the great principles and even lesser rules governing our action, we feel constrained to say, "in fidelity to the oath we have sworn," that this law can be and should be upheld.

The first case is reversed. The other two are affirmed.