Scott, J.
This case comes into this court by petition in error, and the plaintiff seeks to reverse a finding and judgment of the court of common pleas of Wayne county, pronounced and entered in a case of contested election, brought before it by appeal under the statute.
It is claimed, on behalf of the defendant in error, that the finding and judgment of the court of common pleas, in such *588 a case, are not subject to review in tbe appellate courts of tbe state, by petition in error. This court has heretofore, unhesitatingly, and with unanimity of opinion, regarded its jurisdiction, in this class of cases, as unquestionable. Thus, in Ingerson v. Marlow, 14 Ohio St. Rep. 568 (which was a case of this kind), this court took jurisdiction, and affirmed the judgment of the court of common pleas. The same point was then made, on behalf of the defendant in error; but as the judgment of affirmance was in his favor, this question was not noticed in the report of the case. We still entertain no doubt as to our jurisdiction; and think it would be quite anomalous, if no mode were provided for the correction of errors occurring in the court of common pleas, in cases of such grave character, and such public interest, as contested elections usually are. But the statute is explicit on the subject, and provides expressly, that a judgment rendered, or final order made by the district court, the court of common pleas, probate court, justice of the peace, or any other tribunal or board exercising judicial functions and inferior in jurisdiction to the court of common pleas, may be reversed, vacated or modified, by the supreme court, for errors appearing upon the record. A judgment rendered or final order made by the court of common pleas, is also expressly made subject to similar review by the district court.. And the statute declares, among other things, that “ an order affecting a substantial right, made in a special proceeding, is a final order which may be thus vacated, modified, or reversed.” (Code, secs. 511, 512, 513 and 514.) This language leaves no room for doubt, or discussion, on the question of jurisdiction.
Proceeding, then, to the consideration of the case, it is evident that the rights of the parties to this contest, depend upon the legality of the votes claimed by the plaintiff in error to have been duly cast for him, at points outside of the territorial limits of the state, under and pursuant to the provisions of the act of April 3,1863, “to enable qualified voters of this state, in the military service of this state, or of the United States, to exercise the right of suffrage.” If the votes, thus claimed, *589 were duly east and returned, pursuant to a valid enactment of the general assembly of the state, it is clear that the plaintiff in error was elected to the office which he claims; but if those votes are to be rejected, as having been cast without authority of law, it is equally clear that the defendant in error is entitled to the judgment of the court in his favor.
It is claimed, on behalf of McBride, the contestant, that the act referred to, was not intended to authorize votes to be cast outside of the territorial limits of the state; and the proper construction of the act, in this regard, must, therefore, be the first subject of consideration.
Does the act of April 13,1863, purport to authorize elections to be held at points outside of the State of Ohio ?
The first section of the act declares, that whenever any of the qualified voters of this state shall be in the actual military service of this state, or of the United States, and as such, absent from the township or ward of their residence, on the days appointed by law for holding elections within the state, such voters shall be entitled, at such time, to exercise the right of suffrage as fully as if they were present at their usual places of election. A.nd, to enable them to do so, the second section provides, that a poll shall be opened in each company, at the quarters of the captain or other commanding officer thereof; and all electors belonging to such company, who shall be within two miles of such quarters on the day of election, shall vote at such poll, and at no other place. The act contains no terms of limitation, confining its operation to the case of military companies, or of soldiers, who may be within the state on the day of election. On the contrary, its language is general, and its title is clothed in general terms: “ To enable qualified voters of this state, in the military service of this state, or of the United States, to exercise the right of suffrage.” It was well known, at the time of the passage of this act, that the great body of the voters of the state, who were then in the military service of the United States, were in fact outside of the State of Ohio; yet, all such persons were declared entitled to exercise the right of suffrage as fully as though they were *590 at home; and, to that end, a poll was to be opened, on the day of election, in each company, at the quarters of its* commanding officer, wherever the company and the quarters of its commandant might happen to be. The fifteenth section prescribes the form of the poll-books to be kept at elections held under the act, and, in doing so, leaves a blank for the insertion of the name of the state, within which the election may have been held. This would have been wholly unnecessary, unless different states were contemplated as the possible locality of the polls authorized by the act. And the nineteenth section provides, that: “When any election under this act shall be held in this state, all the provisions of the general law in relation to fraud at elections, and the punishment thereof, consistent with the provisions of this act, shall apply to all elections under this act.” The limiting words, “ in this state,” which are found in this section, imply that elections might be held under the act outside of the state, as well as within it, and are wholly without force on any other supposition.
As well, then, from the avowed object and purpose of the act, as expressed in its title, and read in the light of the known military situation of the country, and the location of the Ohio soldiery at the time, as from the very general terms of the leading provisions of the act, found in the first and second sections, and from the tenor and import of the subsequent sections to which we have referred, no room is left to doubt that the legislature intended to authorize elections to be held outside of the limits of the state, as well as within it.
The court below properly so construed the act; but held the act itself to be “ unconstitutional and void, so far as it provides for voting outside of the state, and that all votes polled under its provisions, outside of the state, were illegal, void, and to be held for nought.”
The result of this judgment of the court below, in regard to the invalidity of the act in question, was to declare the defendant in' error elected to the office of probate judge of Wayne county; whilst, had the act been held valid, the plaintiff in error must have been declared elected to that office. *591 The main question in the case arises, therefore, upon the constitutionality of this enactment. Under the constitution of this state, is it competent for the legislature to authorize elections to be held for state and county officers, and votes to be polled, at points outside of the territorial limits of the state?
Written constitutions, under which state governments are organized and conducted are usually rudimental in their character; their provisions are general and are confined to matters supposed to be of essential necessity, or of prime importance. Hence, questions in regard to the constitutionality of an act of the legislature, are, generally, if not always, of grave import. The question in this case is especially so, as it affects in a most important manner, the wielding of the whole political power of the state, through the ballot-box.
Before proceeding to the direct investigation of this question, it will be proper to state some general.principles, which should control our deliberations, and to which the ultimate conclusion should conform.
The following propositions we suppose to be incontrovertibly supported, both by reason and authority.
1. Whilst it is the right and the' duty of judicial tribunals to give full force and effect to the organic law of the state, and, therefore, to declare null and void any attempted acts of legislation which contravene the limitations imposed by the constitution upon legislative power; yet such judicial interference can not be justified in a doubtful case; for “the presumption must always be in favor of the validity of the laws,if the contrary is not clearly demonstrated.” Cooper v. Telfair, 4 Dallas’ R. 14; Armstrong v. Treas. Athens Co., 10 Ohio Rep. 237; C. W. & Z. R. R. Co. v. Comm. of Clinton Co., 1 Ohio St. Rep. 77, and authorities there cited; Goshorn v. Purcell, 11 Ohio St. Rep. 641.
2. By the terms of our state constitution, “ the legislative power of the state” is declared to be “vested in the general assembly.” This grant of power is general in' its terms, not special; it embraces all such legislative power as the people *592 of the state could, under the federal constitution, confer — the whole “legislative power of the state.” The limitations upon the exercise of the power thus broadly conferred, are special, and are to be found in other parts of the same instrument. The act in question is not an encroachment upon the powers or functions delegated to other departments of the government; that is to say, the nature of its subject matter is such as to give its enactment a legislative character; and it is not claimed, in any quarter, that it interferes with the powers specially delegated to the government of the' United States. Therefore, when the power of the general assembly to enact such a law is drawn in question, the proper inquiry is, whether such an exercise of legislative power is clearly prohibited by the constitution. The grant of power being general, the question is as to the existence of a limitation, arising from special prohibition-. Baker v. City of Cincinnati, 11 Ohio St. Rep. 542, 543.
3. Such prohibition must either be found in express terms, or be clearly inferable, by necessary implication, from the language of the instrument, when fairly construed according to its manifest spirit and' meaning. Cass v. Dillon, 2 Ohio St. Rep. 607; Evans v. Budley, 1 Ohio St. Rep. 437.
Proceeding, then, to consider the constitutionality of' this enactment, in the light of the principles just stated, let us first inquire whether it clearly conflicts, in any respect, with the express terms of the constitution.
The provisions of the constitution which relate to the exercise of the elective franchise, are as follows:
Art. II, Sec. 2. “Senators and representatives shall be elected biennially, by the electors in the respective counties or districts, on the second Tuesday of October.”
Sec. 27. “ The election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this constitution, or the constitution of the United States, shall be made in such manner as may be directed by law.”
Art. Ill, Sec. 1. “The executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor, *593 treasurer, and an attorney general, who shall be chosen by the electors of the state, on the second Tuesday of October, and at the places of voting for members of the general assembly.”
Art. IV, Sec. 2. “ The judges of the supreme court shall be elected by the electors of the state at large.”
Sec. 3. “The state shall be divided into nine common pleas districts, . . . and each of said districts . . . shall be subdivided into three parts, ... in each of which, one judge of the court of common pleas for said district, and residing therein, shall be elected by the electors of said subdivision.”
Sec. 7. “There shall be established, in each county, a probate court, which shall be . . . holden by one judge, elected by the voters of the county.”
Sec. 9. “A competent number of justices of the peace shall be elected, by the electors in each township, in the several counties.”
Sec. 10. “ All judges, other than those provided for in this constitution, shall be elected by the electors of the judicial district for which they may be created.”
Sec. 16. “There shall be elected in each county, by the electors thereof, one clerk of the court of common pleas.”
Art. V, Sec. 1. “Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township, or ward, in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections.”
Sec. 2. “ All elections shall be by ballot.”
Sec. 3. “Electors, during their attendance at elections, andi in going to and returning therefrom, shall be privileged from arrest, in all cases, except treason, felony, and breach of the peace.”
Sec. 4. “The general assembly shall have power to exclude from the privilege of voting . . . any person convictedi of bribery, perjury, or other infamous crime.”
Sec. 5. “No person in the military, naval, or marine ser *594 vice of the United States, shall, by being stationed in any garrison, or military or naval station, within the state, be considered a resident of this state.”
Seo. 6. No idiot, or insane person, shall be entitled to the privileges of an elector.”
Art. YIII, Sec. 12. “ So long as this state shall have public works, which require superintendence, there shall be a board of public works, to consist of three members, who shall be elected by the people, at .the first general election after the adoption of this constitution — one for the term of one year, one for the term of two years, and one for the term of three years, and one member of said board shall be elected annually thereafter.”
Art. IX, Sec. 2. “Majors-general,brigadiers-general, col•onels, lieutenants-colonel, majors, captains, and subalterns, ¡shall be elected by the persons subject to military duty in thevr ■respective districts.”
Art. X, Sec. 1. “The general assembly shall provide by law for the election of such county and township officers as may be necessary.”
Sec. 2. “County officers shall be elected on the. second Tuesday of October, until otherwise directed by law, by the qualified electors of each county, in such manner, and for such ■term, not exceeding three years, as may be provided by law.”
Sec. 4. “ Township officers shall be elected on the first Monday of April annually, by the qualified electors of their respective itownships.”
These, we believe, embrace all the provisions of the constitution which can possibly bear upon the question under consideration; and, indeed, several which can have little or no ‘bearing upon the subject, but which we have extracted through abundant caution.
Now, upon these provisions, it may be remarked, in general, that the main object of such of them as relate to the election of particular officers, is, manifestly, to declare by what portion of the electors of the state they shall be chosen. Executive officers of the state are to be “ chosen by the electors of *595 the state; ” judges of the supreme court are to be “ elected by the electors of the state at large; ” judges of the court of common pleas, “by the electors of their subdivision;” probate judges, “by the voters of the county;” justices of the peace, “ by the electors in each township; ” judges other than those provided for in the constitution, “by the electors of the judicial district for which they may be created; ” the clerk of the court of common pleas, “ by the electors of the county; ” members of the board of public works, “by the people;” and military officers, “by the persons subject to military duty in their respective districts.” The prepositions “in” and “of,” following the word “ electors,” in the foregoing connections, are of similar and equivalent import; they express the relation, created by residence, between the electors, and the state, county, district, or township in which they respectively reside; they contain no reference, express or implied, to the place where the elective franchise is to be exercised, but are equivalent to the words “residing in,” or, “who are residents of.”
As to the manner of electing all officers, the only provisions of the constitution are, that “all elections shall be by ballot,” and, that officers shall be elected “ in such manner as may be directed” (or “provided”) “bylaw.”
As to the time of holding elections, the constitution prescribes that, senators and representatives shall be elected biennially, on the second Tuesday of October; the state officers, constituting the executive department, shall be chosen “ on the second Tuesday of October;” members of the board of public works, at the “ first general election after the adoption of the constitution, and annually thereafter; ” county officers, “ on the second Tuesday of October, until otherwise directed by law;” and township officers, “on the first Monday of April, annually.”
As to the place at which elections shall be held, the only express provision of the constitution is, that the state officers composing the executive department, “shall be chosen . . at the places of voting for members of the general assembly.”
It may, then, be very safely affirmed, that whilst all the de *596 tails in regard to the “manner” or mode of holding and conducting elections are expressly referred, by the constitution, to legislative discretion (excepting, only, that all elections shall be by ballot), it contains no express limitation upon that discretion, in regard to the places at which they shall be held.
But, in the absence of any express constitutional provision on the subject, it is insisted, in argument, that the exercise of the elective franchise is impliedly limited, by the first section of the fifth article of the constitution, to the local election district in which the voter resides. This section prescribes, specifically, the qualifications of an elector, and concludes by declaring that every citizen having such qualifications shall “be entitled to vote at all elections.” This last clause, which is, in terms, a mere declaration of the elector’s right, as such, is supposed, by counsel, very clearly, to imply the place in which alone that right can be exercised. The argument is, that the words “ all elections” can hot properly be understood in their broadest sense, otherwise the electors 'of one township, county, or district, would, under this provision, have a right to participate in the election of officers for other townships, counties, or districts; and that'each elector would have the right to vote at as many different places of holding an election for any particular office, as he could reach on the day of election. Inasmuch, then, as the word ilall” must evidently be understood in a limited sense, it is said that the clause is elliptical, and that the ellipsis can only be properly supplied by adding words of limitation, so as to make it read thus: “'And be entitled to vote at all elections ” in their respective townships or wards; or, at such place of his residence. But is it necessary, in order to a proper construction of this clause, to add such words of limitation as will prescribe where the elective franchise is to be exercised, and thus place a restriction upon legislative power, which is not suggested by the terms of the clause, nor even hinted at elsewhere, throughout the instrument? 'Properly speaking, there is no ellipsis at the end of this clause. Without any addition to it, the sentence is syntactically complete, and the sense perfect. There *597 is no ellipsis, to be supplied by the mere grammarian, though there are terms to be construed by the jurist. An example of ellipsis proper, occurs in the first part of this same clause, where the nominative, as well as the auxiliary shall,.is suppressed before the verb “ he entilled.” But the question arising upon the words “ all elections,” is one of construction, and is simply this: What is the intent and meaning of these words, as employed in this section of the constitution? We understand the clause in question to be a definition (perhaps more brief than specific, or accurate) of the elective franchise. Every white male citizen of the United States, possessing certain specified requisites, as to age and residence, is first declared to have the qualifications of an elector; and then, by way of defining the right which these qualifications confer, and which attach to the elector as such, it is added, that he shall “be entitled to vote at all elections.” It is a mere declaration of the franchise or right which belongs to every elector, without any attempt to prescribe the place or manner of its exercise. We are, doubtless, to give such construction to the words “all elections,” as will be in harmony with the other clear and unmistakable provisions of the constitution on the same subject. Now, other portions of the same instrument clearly point out in what elections the several electors of the state may respectively participate, by their votes. And this is uniformly done, not by reference to the places where elections may be held, but to the character of the office to be filled by election, and the residence of the electors. Thus, as we have seen, senators and representatives are to be elected “by the electors in” (that is, residing in,) “the respective counties or districts” which they directly represent in the legislative branch to which they are chosen. The governor and other executive officers of the state, “by the electors of the state; ” judges of the supreme court, “ by the electors of the state at large;” judges of the courts of common pleas, “ by the electors of their respective subdivisions;” judges of probate courts, clerks of the court of common pleas, and county officers generally, “ by the electors of each county ” for which *598 they are severally to be elected; justices of the peace, and township officers generally, “by the electors of their respective townships; ” judges, other than those provided for in the constitution, “ by the electors of the judicial district for which they may be created;” and officers in the militia, “by the persons subject to military duty in their respective districts.” On a well-recognized rule of construction, these various provisions, which specify the portion of electors by whom the different officers shall be chosen, exclude all others from a right to vote at such elections; and are, therefore, limitations or qualifications to be carefully respected in giving a construction to the words under consideration. The general principle which pervades the constitution on this subject, is, that no one shall be allowed to participate in the election of officers whose jurisdiction will not extend over him, or territorially include the place of his residence; but that the electors of each district or civil subdivision of the state, shall have the right to select their own official representatives, or public functionaries. And, keeping in view the limitations to which we have referred, there can be but little danger of misunderstanding what is meant by an elector’s right “to vote at all elections.” It is very clear that this phrase would not be correctly expounded, either by the words which counsel propose to add, or by any other words having reference solely to the place at which an election may be held. For, in the case of an election for officers in the militia, though it might be held at the residence of a person having the qualifications of a general elector of the state, yet if, by reason of age, disability, or otherwise, such person is not “ subject to military duty,” he has no right to vote at such election. We think that, under a proper construction of the constitution, persons having the qualifications of an elector, may justly claim “ a right to vote at all elections ” of officers of the state, and of such other civil officers as, Try the provisions of the constitution and, laws, are to he chosen hy the electors of the county, township, ward or district in which such persons respectively reside. And whatever terms may be regarded as most apposite for the expression of this idea, we *599 trust enough has been said to show that the place of holding an election is-not the criterion, and furnishes no essential part of the test, which limits the elector’s right to vote “ at all elections.,” Besides, a right to vote at all elections, does not import, as counsel seem to suppose, a right to vote af, all places of holding elections. The election of a governor of the state, for example, is a single election, although the law provides for its being held simultaneously at more than a thousand different places within the state. A right to vote at all elections does not, therefore, import a right to vote at more than one of the places prescribed by law for holding an election, any more than it imports a right to vote more than once at the same place; nor is it necessary to supply a supposed ellipsis in order to avoid such a construction. We find nothing, then, in this section which refers, in the slightest degree, even by inqolication, to the place of holding elections.
Had it been the intention of the framers of our present constitution to fix or limit, by this section, the place at which the elective franchise should be exercised by the voters respectively, it is quite remarkable that no attempt should have been made to do so, in express terms; that such an important limitation of legislative power should have been left to be gathered from a supposed ellipsis — from something which is not said — or to be inferred from a declaration of the elector’s “right to vote at all elections.” And it is the more remarkable because, in the corresponding section of the constitution of 1802, which defines the qualification's of electors, there was a clause of express limitation, in the following terms: “No person shall be entitled to vote, except in the county or district in which he shall actually reside at the time of the election.” Now, the fact that this clause was wholly excluded from the present constitution, and no express limitation a-s to the place of .voting was inserted in its stead, would seem to be quite significant. It is in this part of the constitution, which treats solely of the elective franchise, that we should naturally expect to find, if any where, a restriction limiting the place of its exercise. Here such restriction was placed, in express *600 terms, by the constitution of 1802, and from this, its appropriate place, it was stricken out in the constitution of 1851, and inserted in no other place. On the contrary, the latter instrument declares, in the most general terms, that “ county officers shall be elected . . in such manner . . as may be provided by law.” And that officers, whose election is not provided for in the constitution, shall be elected “in such manner as may be directed by law.” We think it may be very fairly inferred, that whilst the constitution defines the qualifications of electors, and prescribes by what portion of them all officers shall be chosen, it was intended to leave all further details, whether as to the place of holding elections, or the mode in which they should be conducted,'to the wisdom of the legislature, to be provided for, and modified, from time to time, as the ever-varying circumstances of the unknown future might seem to require. If prohibition was intended, why should the direct and express restriction of the former constitution have been rejected, and the matter left to vague conjecture, and doubtful inference?
It is said, in argument, that this section, by prescribing as one of the qualifications of an elector-, that he “shall have been a resident of the state one year next preceding the election, and of the township, county or ward, in which he resides, such time as may be provided by law,” has localized and limited the place where the elector’s right of voting must be exercised. Rut we do not clearly see the force of the logic on which this conclusion rests. Without entering into a labored disquisition upon thb import of the words “resident” and “residence,” it may be safely assumed that, in the proper interpi etafion of the constitution, the word residence may be regarded as synonymous with home; and that to. reside in a particular place, means to have one’s home there.' Such has long been its popular sense, and so it is used in statutes of the state passed before .the adoption of the present constitution, and still in force. In the act of 1841, “to preserve the purity of elections” (1 S. & C. St. 548), the word residence is thus defined: “First. That place shall be considered and held to be the resi *601 dence of a person in which his habitation is fixed, without any present intention of removing therefrom; and to which, whenever he is absent, he has the intention of returning.” And to this is added: “Second. A person shall not be considered or held to have lost his-residence, who shall leave his home, and go into another state, or county of this state, for temporary purposes merely, with an intention of returning.” Here, it is evident, that “residence” and “home” are used as convertible terms. We concede, then, that the constitution makes the “residence” the “fixed habitation,” or “home,” of the voter, an essential part of his qualifications as an elector. It is the sole object of this section to define those qualifications, and to declare the right which they confer. It speaks of nothing else. And it is clear that the qualifications which confer the right to vote, and the place at which that right may be exercised, ar'e things quite distinct from each other. The elector who temporarily leaves wife, children and “ home,” for the defense of -his state and nation, with the intention of returning when his services are no longer demanded, does not thereby lose his residence, or cease to have a fixed local habitation and a home; nor does he lose the legal rights which that residence may confer. To qualify a person for voting for township officers, residence in the township, is clearly necessary. But it does not follow, as a logical consequence, that the right to vote can be exercised only within the township. If the enjoyment of the right is thus limited by the constitution, the restriction is not to be found in this section.
A farther objection is raised as to the validity of this law on account of the form in which it is enacted. The 16th section of the 2d article of the constitution provides as follows: “ Every bill shall be fully and distinctly read on three different days, unless, in case of urgency, three-fourths of the house in which it shall be pending, shall dispense with this rule.. No bill shall contain more than one subject, which shall be clearly expressed in its title; and no law shall be revived or amended, unless the new act contain the entire act revived, or the section or sections amended; and the section or sections so amended *602 shall be repealed.” Now, it is said, that the law in question is invalid, because it fails to comply with the requirements of the third and last clause, or provision, of the section just quoted, in this: that, though in several of its provisions it changes, and, therefore, is amendatory of the general election laws of the state, yet it does not contain the sections of the old law which are thus amended; nor does it expressly repeal any of them. Let us briefly examine this objection. The constitutional provision supposed to be violated (omitting what is irrelevant), reads thus: “No law shall be . . . amended, unless the new act contain . . . the section or sections amended; and the section or sections so amended shall be repealed.” From the argument of counsel, we are led to suppose that the objection to be considered rests, mainly, on what we conceive to be a misunderstanding of the meaning of this clause. We understand the main objection to be, that in the new act, the sections of the prior statutes, which it is supposed to modify or amend, are not set out and recited in full. We think the phraseology, reasonably construed, does not require this to be done. As we understand this clause of the constitution, it requires, in the case of an amendment of a section or sections of a prior statute, that the new act shall contain, not the .section or sections which it proposes to amend, but the section or sections in full, as it purports to amend them. That is, it requires, not a recital of the old section, but a full statement, in terms, of the new. one. Such has been the almost uniform legislative construction given to this clause; and a different judicial construction would invalidate nine-tenths of the amendatory acts of state legislation passed since 1851. Whatever inference might be drawn from the debates in the constitutional convention, every provision of the constitution should be construed agreeably to the import of its terms, as they may be fairly presumed to have been understood by the people, whose ratification alone gave validity to the whole instrument.
Now, in regard to the act before us, it may be said that it does not, either in its title or anywhere in the body of it, pur *603 port, in terms, to be amendatory of a former statute or statutes, or of any section or sections of a former act. Yery few of its provisions were intended to supersede or take the place of any former enactments. It is, in fact, in its main provisions, and in its general scope and purpose, an independent and original act of legislation, upon a subject not embraced in prior statutes, and in respect to which there had been no previous legislation. Its purpose, as declared in its title, was “to enable qualified voters of this state, in the military service of this state, or of the United States, to exercise the right of suffrage.” On this subject there was no prior legislation to be amended.
The act was intended to provide for a particular case, not hitherto provided for — that of voters in the military service; and as to the place and manner in which all other electors should exercise the right of suffrage, prior enactments were left unchanged and in full force. As to them, the law was not amended, and it was properly not repealed, because it was intended that it should still operate with full vigor.
But if we regard the act under consideration as properly amendatory of prior election laws (as some of its provisions, no doubt, are), yet all its sections are fully set out, in express terms. The constitutional provision to which, it is said, this act does not conform, was intended, mainly, to prevent improvident legislation; and with that view, as well as for the purpose of making all acts, when amended, intelligible, without an examination of the statute as it stood prior to the amendment, it requires every section which is intended to supersede a former one to be fully set out. No amendments are to be made by directing specified words or clauses to be stricken from, or inserted in, a section of a prior statute which may be referred to; but the new act must contain the section as amended. In this particular, we think, the act before us is not liable to exception. It is true, that some of its provisions are intended to change and supersede kindred provisions in the general election laws of the state. Eor example: it extends the time for receiving and opening the returns of votes *604 cast under the act, and of making- abstracts thereof, and foi giving certificates of election, to thirty days from the day of election; whilst the general election law of 1852 required the same acts to be performed within six days from the day of election; and it extends the time for giving notice of a contest of the election, to twenty days after the opening of the returns, whilst the law of 1852 required such notice to be given within twenty days from the day of election.
The only just ground of exception to the regularity of these amendatory sections, is, that the former provisions of the statute, which are thus amended and superseded, are not expressly declared to be repealed. But, we are satisfied that the clause of the constitution which requires that “the sections so amended shall be repealed,” is merely directory to the general assembly; and that a statute can not be judicially declared invalid because that direction has not been complied with. This section of the constitution contains two distinct provisions preceding the one under consideration; first, that “ every bill shall be distinctly read on three different days,” etc.; second, that “no bill shall contain more than one subject, which shall be clearly expressed in its title.” In the case of Miller & Gibson v. The State (3 Ohio St. Rep, 475), the first of these provisions came under examination, and was held to be^ directory only. ' At least, the court say, “ this is an important provision, without doubt; but, nevertheless, there is much reason for saying that it is merely directory in its character, and that its observance by the assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts. Any other construction, we incline to think, would lead to very absurd and alarming consequences.” The second provision Avas considered in the case of Pim v. Nicholson (6 Ohio St. Rep. 176), where.the court held, that “this clause was incorporated into the constitution for the purpose of making it a permanent rule of the houses. It is directory only, and the supervision of its observance must be left with the general assembly.” We think the reasons are equally cogent for regarding the subsequent clause, in regard *605 to repeals, as also directory in its character, and that a contrary holding would result in consequences truly “ alarming.” It would at least nullify many statutes which the courts and the people of the state have hitherto regarded as valid, and have governed themselves accordingly in their transactions. We can not think that this clause was intended to abolish the doctrine of repeals by implication, and to reverse the established maxim, that where statutes are inconsistent with each other, the latter repeals the former. On the contrary, it was intended to secure and enforce the application of the principle embodied in this maxim, by directing the general assembly to act in accordance with it, by expressly declaring the former inconsistent and amended statute to be repealed.
The constitution of Maryland contains the following clause: “No law shall be revived, amended or repealed by reference to its title only.” In giving a construction to this clause, in the case of Davis v. The State (7 Md. Rep. 152), the court said: “ This was intended to prevent .incautious and fraudulent legislation. It does not apply to an independent act establishing a new, or reviving some previous, policy of the state. In such cases the enactment of one law is as much a repeal of inconsistent laws, as if the latter were repealed by express words.” The application of this principle to the act before us is apparent.
The clause in question was, clearly, not intended to deny or limit the legislative power of repeal in any case, but simply to direct the mode in which that power should be exercised; and, in this respect, it is of the same character with the preceding clauses of the same section; and if they are directory merely, we are unable to • say that the last clause is clearly otherwise.
Again, it is urged that the law in question is in conflict with the 26th section of the 2d article of the constitution, which provides, that “ all laws of a general nature, shall have a uniform operation throughout the state.” Under the former constitution, laws having a general subject matter, and, therefore, “ of a general nature,” were frequently limited expressly, *606 in their operation, to one or more counties, to the exclusion of other portions of the state. As a consequence, on the same subject, there might be one law for Hamilton county, another for Franklin, and still a third for Ashtabula. This naturally led to improvident legislation, enacted by the votes of legislators who were indifferent in the premises, because their own immediate constituents were not to be affected by it. To arrest and, for the future, prevent this evil, the provision in question was inserted in the present constitution. But the law in question is the same for every part of the state; its operation is “uniform throughout the state.”- Its subject matter is the exercise of the elective franchise by electors of the state who are in its military service, or in that of the United States. And its provisions are the same for all such electors of the state, wherever their place of residence may be, and for all elections of officers for the state, and any and every portion thereof. Being thus uniform in its operation throughout the state, it is, clearly, in harmony with this provision, and does not fall within the mischief which it was intended to prevent. It is said, however, to be a species of class legislation, because its operation is limited to the case of electors who are in the military service of the state, or of the United States, and does not embrace all the electors of the state who may be absent from their place of residence on the day of election. But, class legislation, of this kind, is of frequent occurrence, and has never been supposed to be in conflict with the constitution. Many statutes are intended to operate exclusively, or mainly, upon certain classes of persons; as, for example, upon attorneys at law, auctioneers, brokers and bankers, etc.; criminal laws impose their penal sanctions only upon transgressors; and the elective franchise itself, is, by the constitution, limited to a class of citizens composing less than' one fourth of the whole. By statutes repeatedly enacted under the former constitution, voters, in attendance at court, on days of election, were authorized to. vote at the county seat, instead of their own township polls. Yet, it is apparent that all such enactments, though operating only on classes of persons, do *607 not, for that reason, fail to have a uniform operation throughout the state. The argument, however, is, that the general assembly should not have discriminated between the case of the citizen soldiers, who are, compulsorily, or patriotically, absent from home on the day of election, periling their lives in defense of the life and integrity of the nation, and who constitute perhaps more than one fourth of the electoral body of the state; and the case of such few electors as may be voluntarily absent, in the pursuit of personal pleasure or gain. But if this objection be well taken (as to which, opinions may differ), still it goes only to the policy and wisdom of the enactment, and not to its constitutionality. It is not to be for- ■ gotten, that this law does not extend the elective franchise; it confers it upon no one. Its only object and aim is, so to provide that one third or one fourth of the citizens of the state, to whom the constitution guarantees the elective franchise, ■ shall not he disfranchised through their devotion to the vital interests of their country. The state has an undoubted right to demand the services of as many of her electors as she may deem necessary for her defense; and when, in the exercise of this right, she summons them to arms, and, at the same time, by her legislation, renders their constitutional “right to vote at all elections” available, by providing means for its exercise, and thus places them on a mere footing of equality, in this respect, with those electors who remain at home, such legislation can not be called “ class legislation,” in any odious or objectionable sense.
Again, it is urged that the law in question is null and void, in so far as it assumes to authorize elections to be held at places outside of the state. This objection rests, not on the ground of a constitutional limitation of the legislative power of the general assembly, but on the supposed want of power in any and every state, under the general principles of international law, to give an extra-territorial effect to any of its enactments. The argument, in brief, is, that the people of the state, in their collective capacity, never possessed such a *608 power, and, therefore, can not have delegated it to the general assembly.
It is undoubtedly true, that legislative enactments can only operate, proprio vigore, upon persons and things within the jurisdiction of the law-making power. And it is also true, generally, that such jurisdiction can only be coextensive with the territorial limits of the state, or sovereignty. But, does the recognition of these principles, necessarily invalidate the law in question? We think, clearly not.
The operation of the law, that is to say, the effect which the law gives to the acts which it authorizes, is limited to the state and its own citizens, over whom its jurisdiction can not be questioned. Its subject matter is- the election of Ohio officers, whose sphere of official action lies wholly within the state, and who are the creatures of its sovereign will. In so far as Ohio may be regarded as an independent sovereignty, she has a right, as such, to adopt such form of government as she may think proper, and to provide for the creation of such officers, and to invest them with such powers, as she may deem expedient for the proper administration of good government ■within her own borders. And' she may ordain that such officers shall be elected, or appointed, in such manner, and by such persons, as she may think proper. All such power is implied in the idea of sovereignty. If a sovereign state, in any quarter of the world, should see fit to declare that all her officers should be appointed and commissioned by the Bey of Algiers, in so far as the result would affect herself, or her citizens or subjects alone, I do not readily perceive how, or by whom, her right to do so could be questioned. Whether the act of election, or appointment, were to be made outside of, or within, her own territorial limits, would be a question which concerned herself and her citizens alone; and in the determination of which there could, therefore, be no conflict with the legitimate jurisdiction of any other sovereignty. With such a case, international law could have nothing to do.
The statute law of the state prescribes how, and before whom, depositions may be taken outside of the state, and the *609 effect which shall be given to them, when thus taken, in the tribunals of the state. The power of the state legislature, thus to give effect within the state to acts done outside of its limits, ■ has, I believe, never been questioned. And the same may be said in regard to statutes prescribing, the solemnities essential to the validity of deeds of conveyance, and of wills, wherever executed, affecting property, the situs of which is within this state. Over all such subjects, the legislative authority of the state is absolute, and her jurisdiction exclusive.
Now, as the sole purpose and scope of the law under consideration, is to declare in what manner her own citizens, resident within her own territory, engaged in her service, or in that of the nation of which she forms an integral part, and who are, by her organic law, invested with all the rights pertaining to the elective franchise, may cast their ballots at any place of which they hold actual military occupation, whether within or outside of the state, for officers of the state, or its civil subdivisions, and to declare the effect which shall be given, within the state, to ballots thus cast; I am wholly unable to perceive how such legislation can be held invalid, on the ground of a want of jurisdiction. Such a law is not extraterritorial in its operation, and is clearly within the just sphere of the legislative power of the state. Its whole subject matter, whether considered in reference to the rights of the electors, or in respect of the officers to be elected, is one of exclusive state jurisdiction.
It must be conceded that, in authorizing elections to be: held outside of the state, it may be found difficult to protect the independence of voters; to scrutinize thoroughly the right of all who claim to be .entitled to the elective franchise; to prevent frauds at elections, and in the returns thereof, and, preserve their purity, by the infliction of penalties upon the' perpetrators of fraudulent acts; and to surround the exercise* of this important franchise with al] the safeguards which might be thought advisable. These difficulties are, perhaps, much less formidable than has been supposed in argument. The-poll-books of the elections authorized by the act, are required' *610 to show the name of every voter, with his alleged place of residence, and thus furnish the means of exposing and setting aside illegal votes. And I am by no means disposed to concede that citizens of the state, who owe obedience to her laws, and are in her actual service, can not be held responsible in her tribunals, upon them return to the state, if, in the exercise of rights conferred on them by her laws, even outside of her territory, they are guilty of a corrupt violatipn of the very laws of which they claim the benefit. On the contrary, I am quite clearly of a different opinion. But it is unnecessary to discuss this question; for, admitting the existence of all the difficulties which have been suggested, and the seriousness of their character, still they present considerations which address themselves solely to legislative wisdom and discretion. If, in the unforeseen and peculiar situation of the country, rather than to allow more than 100,000 voters of the state to be practically disfranchised, the general assembly has thought it just and wise to permit the elective franchise to be exercised in places, and under circumstances, which necessarily lessen ■the number and efficiency of the safeguards which might otherwise have been thought expedient, the courts have no super'visory power over the exercise of a discretion which the con■stitution intrusts to that body. Our inquiry relates solely to the existence of the power, and not to the wisdom, the policy -or prudence with which it may have been exercised.
Laws having a similar object with the one under consideration, have been enacted, or proposed to be enacted, by several •of our sister states; and we have the opinions of the supreme ■courts of those states on the question of the constitutionality and validity of such legislation in their respective states. It is obvious, however, that the relevancy of those opinions to this case, must depend on the coincidence of’.the constitutions of those states with our own, in respect to the subject of the elective franchise, and on the similarity of the statutes reviewed by these courts to the -acts now under our consideration.
The constitution of Pennsylvania requires the elector to .have resided for ten days immediately preceding the .election *611 “in the election district where he offers to vote.” It was held, by the supreme court of Pennsylvania, that this phraseology imports that manual delivery of the ballot to the proper officer is to be made by the elector in the election district in which he resides, and that the legislature could not, therefore, authorize ballots to be cast outside of the election districts of the state. Chase v. Miller, 41 Penn. St. R. 403. The absence of any such clause in our state constitution, renders this decision inapplicable to the case before us.
So, in Connecticut, it was held, by the judges of the supreme court of that state, that various provisions of their state constitution clearly prescribed the place at which only the annual election could be held, viz: “m an ‘elector’s meeting,’ com•posed of the electors in the several towns, duly warned, convened, organized and held for that purpose;” that these provisions were so clear as to leave no room for construction, nor for doubt that the votes of the electors could be taken in no other place. But it was said by the judges, in their official opinion, that if the time, place and manner of holding elections had not been thus clearly and sufficiently fixed and prescribed by the constitution, it would, by implication, be “incident to the general legislative power” to do so. Independent of the express limitations of the constitution, they do not seem to have questioned the power of the legislature on the ground of the supposed extra-territorial operation of a law authorizing elections to be held outside of the state. (Opinion of the judges), 2 Am. Law. Reg. N. S. 460.
And in the opinion of the justices of the supreme judicial court of New Hampshire, given to the legislature of that state in 1863, upon the constitutionality of a bill having for its object to authorize electors who, in time of war, etc., being in the military or naval service of the state, or of the United States, should be without the limits of the state on the day of election, to vote in the towns of their respective residence, hy attorney, it was held, that, by the common law, every vote, at public elections, must be given personally by the voter, and could not be cast by attorney in the absence of the voter. The *612 question thus decided, is not involved in the case before us. The act we are considering, does not purport'to authorize voting by attorney. 2 Am. Law Reg. N. S. 740.
On the other hand, though the constitution of Iowa makes it one of the necessary qualifications of an elector that he shall have been for sixty days, next preceding the election, a resident of “ the eounty in which he claims his vote;” yet the supreme court of that state has held, that a statute authorizing elections to be held outside of the state is not in conflict with this provision of the state constitution. Morrison v. Springer, 15 Iowa Rep. 304.
We may dismiss this brief reference to decisions of other states with the remark, that such of them as were adverse to the existence of the legislative power were apparently warranted by the clear language of the respective state constitutions under which the several enactments ay ere made; and that in the Iowa case, Avhere the validity of the law was sustained, there was much more room for doubt than in the case before us.
It has been said that the framers of the constitution never contemplated that, under it, laws would be enacted authorizing elections to be held outside of the state. This is probably quite true. But if so, it is at least equally certain that the circumstances Avhich, in the judgment of the legislature, rendered such a law expedient and necessary, could not have been foreseen or anticipated by them. If, conscious of human inability to penetrate the vail which conceals the future, they have not attempted to provide, in detail, for all its unknown exigencies and wants, but have referred such provision to subsequent legislative discretion, is it clear that, in so doing, they acted unwisely ? By the consideration and judgment of the people of a number of our sister states, who have recently amended their state constitutions so as to permit -such legislation, this question has been answered in the negative.
But, after all, the question is upon the restraints which the constitution has, in fact, imposed upon legislative discretion, and not as to what might or probably would have been done *613 bad this legislation, and tbe circumstances wbicb induced it, been contemplated as a future possibility.
We have now noticed, and have endeavored, however imperfectly, to examine and consider the various grounds upon which the learned and able counsel for defendant in error have urged the unconstitutionality of this law. And we have done so with an earnest purpose, on the one hand, not to sanction a palpable infraction of any of the provisions of the constitution, when fairly construed according to their spirit and meaning, and, on the other hand, not to assume a veto power which has never been delegated to us. The result is, that we are wholly unable to discover a palpable repugnancy between the law and the constitution of the state, or to say that the statute is invalid for want of legislative power to enact it.
A farther question is made as to the sufficiency and regularity of some of the poll books of the elections held outside of the state. The 7th section of the act provides that, “The poll books shall name the company and regiment ... in which such-election is held.” Some of the poll books, in this case, designate the company in which the election was held by its letter and the number of the regiment, but do not expressly state the particular arm of the service of which it forms a part, nor the fact that it is an Ohio regiment. We are of opinion that the latter fact should be presumed where nothing appears to the contrary, inasmuch as the voters are resident citizens of Ohio, and that the former defect is not one of substance such as should invalidate the return.
Objection has also been taken to the regularity and sufficiency of other poll books on various grounds, not necessary to be considered or stated, inasmuch as their determination either way would not affect the result of the election.
The finding and judgment of the court of common pleas will be reversed; and this court, proceeding to adjudge as the court of common pleas should have done, find the law of the case to be with the said contestees, and adj.udge accordingty-
Brinkebhoee, C. J., and Wilder and White, JJ., concurred.